The **BERYLLIUM CORPORATION**

v.

The **UNITED STATES.**

No. 9–68.

United States Court of Claims.

Oct. 15, 1971.

David V. Anthony, Washington, D. C., for plaintiff. Gilbert A. Cuneo, Washington, D. C., attorney of record. David V. Anthony, Buel White, Sellers, Conner & Cuneo, Washington, D. C., and Oscar Brown, Philadelphia, Pa., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

### ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge:

This case involves a dispute between the Beryllium Corporation, plaintiff, and the United States, arising out of a contract for the production and sale of beryllium billets and end-products by the plaintiff to the Atomic Energy Commission (AEC) for its own use, as well as that of the Department of Defense (DOD) and other governmental agencies.

Beryllium is a light, hard metal made from beryl ore and is in relatively scarce supply. Prior to September 1, 1956, the AEC supplied its own needs and those of other governmental agencies from the operation of government plants by Brush Beryllium Company (Brush). The government, after making a survey of its needs, decided to transfer the production of this metal to private industry, and to that end solicited bids from thirty different companies to furnish 1,000,000 pounds per year. Contract 465 was awarded to plaintiff. A similar contract was awarded to Brush.

The contract with plaintiff was effective September 1, 1956, and was to run to August 31, 1962. It called for the delivery of 500,000 pounds of beryllium in billets at $46.02 per pound. Deliveries were to commence not later than eleven months after September 6, 1956, and were to continue at a rate of approximately 100,000 pounds per year. Amortization of the plant, not to exceed $1,680,000 was included in the contract price. Plaintiff was also to be paid $177,000 as start up costs upon delivery of the first 100,000 pounds of beryllium. The contract specified that plaintiff would not lose its investment in the plant in the event the contract was terminated for the convenience of the government. The AEC had the right to divert to other purchasers such quantities of the metal as might be determined by the contracting officer only for government use or fabrication of or incorporation in items to be supplied to the government. Such sales to other purchasers were to have the same effect as if the beryllium had been delivered to the AEC.

The plaintiff built its plant but was unable to deliver the billets within the eleven-month period specified in the contract. It delivered its first acceptable billet about nine months late. The government considered terminating the contract for default, but after a conference with plaintiff, it decided to reduce the quantities of beryllium to be received from both plaintiff and Brush because of a lessening demand of the government for the metal. The AEC sent plaintiff a notice of partial termination on June 27, 1958, effective June 30, 1958. The contract was then amended by the parties by Modification No. 1 (not material here) and by Modifications Nos. 2 and 3.

By the terms of Modification 2, effective June 30, 1958, the quantity of beryllium to be delivered by plaintiff was reduced from 500,000 to 187,500 pounds. The delivery schedule was changed to "approximately 37,500 pounds per year," with deliveries after September 1958, to be made "substantially at the contract rate." The deliveries were to be made "each calendar quarter in quantities of not less than 7,000 pounds nor more than 15,000 pounds of beryllium metal." The contract period was extended to June 1, 1963, and the price was increased to $64 per pound.

Because of the partial termination of the contract for the convenience of the government, the plaintiff was paid $1,880,000 as a settlement for the reduced quantity of beryllium to the extent of 312,500 pounds. This payment included $1,747,000 for the cost of plaintiff's plant, plus $133,000 other costs.

By Modification 3, it was provided that sales of beryllium in any form (billets, fabricated parts, scrap, etc.) to the government or its contractors would count as deliveries under the contract. (The original contract provided for billets only).

The plaintiff entered into a contract in January 1962, with Continental Ore Corporation (Continental) to sell 150,000 pounds of beryllium to Continental which in turn was to deliver the billets to Commodity Credit Corporation (CCC) in exchange for surplus agricultural products under a barter arrangement. The CCC proposed to stockpile the billets under a law enacted by Congress authorizing it to do so after plaintiff and the AEC had executed their original contract. In 1956 the CCC was not authorized to stockpile beryllium. The plaintiff delivered 32,620 pounds of beryllium to Continental during the first six months of 1962 and 75,901 pounds between July 1, 1962, and May 31, 1963. Plaintiff did not report these sales to the AEC because it contended, and still contends, that the sales to Continental do not count as deliveries under its contract with the AEC. The AEC contends otherwise. This is one of the points in controversy in this case, as will be discussed more fully below.

In the meantime, the plaintiff had been delivering beryllium under its contract with the AEC. The following table shows all deliveries under both the AEC and Continental contracts:

| Dates | Beryllium products | Billet to CCC | Billet "Tendered" to AEC in dispute | Scrap purchased |
|---|---|---|---|---|
| | *Pounds* | *Pounds* | *Pounds* | *Pounds* |
| 7–1–58 to 6–30–69 | 33,402.09 | | | 1,171.77 |
| 7–1–59 to 6–30–60 | 37,331.79 | | | 5,781.67 |
| 7–1–60 to 6–30–61 | 75,668.56 | | | 17,773.11 |
| 7–1–61 to 6–30–62 | 25,752.52 | 32,622 | 15,980.8 | 15,291.71 |
| Total (6–20–62) | 172,154.96 | | | |
| 7–1–62 to 6–1–63 | 21,537.94 | 75,901 | | 25,257.71 |
| Total | *193,692.93 | | | 65,275.97 |

* 226,314.93 lbs. with the 32,622 lbs. of billet delivered to Continental prior to July 1, 1962 and 302,215.93 lbs. with total deliveries to Continental through May 31, 1963.

On June 20, 1962, plaintiff tendered 15,980.80 pounds of beryllium to the AEC under its contract. The AEC refused to accept it on the ground that on that date it had already purchased 172,154.96 pounds from plaintiff during the four years the contract had been in force, whereas, according to the contract it was only required to purchase 150,000 pounds during such four-year period (37,500 pounds per year). The plaintiff stored the 15,980.80 pounds and later used the beryllium in manufacturing parts which it sold. The plaintiff made a formal claim to the AEC for payment for the tendered metal. The problem was submitted to the contracting officer, who denied plaintiff's claim. The plaintiff then appealed to the AEC, which referred it to a hearing examiner, pursuant to AEC regulations.[1] The examiner conducted hearings and on May 1, 1964, rendered a decision in favor of the plaintiff on all the issues. In substance, he held that plaintiff's deliveries in excess of 37,500 pounds in a year were not to count as deliveries under the contract; that the sales to Continental were not to be credited as deliveries under the AEC contract; and that by refusing to accept the 15,980.80 pounds on June 20, 1962,

from the plaintiff, the AEC had terminated the contract for the convenience of the government. The examiner remanded the case to the contracting officer for settlement negotiations on this basis.

Both parties appealed to the AEC for review of the examiner's decision. The appeal by plaintiff is not material to this decision, as it involved complaints on matters not now before us, such as objecting to the ruling that the contract was terminated for the convenience of the government as to undelivered beryllium; that deficiencies in 1959 and 1960 deliveries could not be made up as a part of the tender of June 20, 1962; and that the deliveries in 1963 were beyond the scope of the proceeding. The AEC denied plaintiff's appeal.

The contracting officer appealed to the AEC from the examiner's decision asserting that the examiner was in error in holding that the deliveries required by the contract were not completed before the date of the tender, and in holding that the deliveries to Continental were not allocable to the AEC contract. The AEC granted the appeal of the contracting officer and reversed the decision of the examiner on all points and dismissed

[1]. 10 CFR, Part 2. (Published in 27 Federal Register, 377, January 13, 1962). The AEC did not have an appeals board at that time.

plaintiff's claim. The plaintiff then filed suit in this court. Both parties have moved for summary judgment.

Both parties agree that the two basic questions to be decided are: (1) Whether deliveries in excess of 37,500 pounds per year count as deliveries under the contract, and (2) Whether the deliveries to Continental for the CCC count as deliveries under the AEC contract. We will consider these questions in the order listed.

■■■ The case is before us for review under the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1964). The defendant contends that the decision of the AEC is entitled to finality and should be upheld by the court under the standards of the Wunderlich Act. Of course, the court is bound to accept the findings of fact of the AEC if they are not arbitrary or capricious and are supported by substantial evidence. This is not true on questions of law, as these questions are reserved for final decision by the court. The court is not bound by a decision of an agency on a question of law. Sundstrand Turbo v. United States, 389 F.2d 406, 411, 182 Ct.Cl. 31, 40 (1968); Mountain Home Contractors v. United States, 425 F.2d 1260, 192 Ct.Cl. 16, 23 (1970); and Bailey Specialized Bldgs., Inc. v. United States, 404 F.2d 355, 360, 186 Ct.Cl. 71, 81 (1968). However, if the decision of the agency on a question of law is deemed by the court to be correct, the court may, and frequently does, adopt the decision of the agency on such question.

In the instant case, the defendant argues that to the extent the decision of the AEC is based on findings of fact, it is entitled to finality, and to the extent it is based on decisions of law, it is correct and should be sustained by the court.

■■■ The plaintiff says that both of the questions to be decided in this case are questions of law, because they involve and depend upon the interpretation of the contract. The courts have held many times that the interpretation of a contract involves a question of law and is a function to be performed by the courts. *See* Max Drill, Inc. v. United States, 427 F.2d 1233, 192 Ct.Cl. 608, 614 (1970); Dynamics Corporation of America v. United States, 389 F.2d 424, 429, 182 Ct.Cl. 62, 71–72 (1968); Hol-Gar Mfg. Corp. v. United States, 351 F. 2d 972, 974, 169 Ct.Cl. 384, 386 (1965).

■■■ We agree with the plaintiff that the problems before us involve the interpretation of the contract and are, therefore, questions of law to be decided by the court. The defendant does not entirely disagree, but argues for a different interpretation than that advocated by the plaintiff.

■■■ The question of whether deliveries in excess of 37,500 pounds in a year count as deliveries under the contract is governed by the meaning of Modification 2 to the contract, which, in pertinent part, is as follows:

AGREEMENT

MODIFICATION, NOW THEREFORE, Contract No. AT(11–1)–465, as previously supplemented, is further amended and modified as follows:

1. Article I, Section 1, of the contract is amended and modified to read as follows:

"1. The Contractor will deliver F.O.B. carrier, Contractor's Plant, Hazleton, Pennsylvania, 187,500 pounds of beryllium meeting the specifications set forth in Section 2 of Appendix A to this contract."

2. Article II, Section 1, is amended to read as follows:

"1. *Term.* The term of this contract shall extend from the effective date hereof until June 1, 1963."

3. Article II, Section 3, is amended to read as follows:

"3. *Delivery Schedule.* The Contractor shall make deliveries of beryllium at a rate of approximately 37,500 pounds per year. Deliveries after September, 1958 shall be at substantially the con-

tract rate; such deliveries shall be made each calendar quarter in quantities of not less than 7,000 pounds nor more than 15,000 pounds of beryllium metal. Shipments shall be consigned as designated by the Contracting Officer. Unless otherwise mutually agreed, delivery of the beryllium specified in Article I shall be completed within the term of this contract."

The AEC interpreted the meaning of Modification 2 in its decision in pertinent part as follows:

Its [delivery schedule] position in the contract and its [delivery schedule] phrasing in terms of approximation demonstrate that it was not the dominant measure of the obligation of the contract. The extrinsic evidence confirms that interpretation.

Contract 465 was a contract for the sale and delivery of a total number of pounds of beryllium metal during the contract term. The delivery schedule was a subsidiary provision. Norrington v. Wright, 115 U.S. 188, 203–204 [6 S.Ct. 12, 29 L.Ed. 366]; Mersey Co. v. Naylor, 9 App.Cas. 434, 439; Chicago Ry. Equipment Co. v. Superior Charcoal Iron Co., 12 F.2d 235 (C.C.A.6); Bullard v. Eames, 219 Mass. 49, 106 N.E. 584; Providence Coal Co. v. Coxe, 19 R.I. 380, 582, 35 A. 210. The provisions which established a schedule for deliveries did not increase the total obligation imposed on the Government, and deliveries for which the Government provided a market fulfilled its obligation whether or not they were ahead of schedule. The contract was for the total quantity; in addition to deliveries of the specified billet to the Commission, other sales of beryllium to Government agencies and contractors were credited to the contract upon shipment; and the delivery schedule determined whether any material was due for delivery and acceptance.

We think this interpretation was correct. The dominant and main purpose of this amendment to the contract was to provide for the sale and delivery by the plaintiff of 187,500 pounds of beryllium to the government and its agencies. The schedule of delivery of "approximately 37,500 pounds per year" was a subsidiary or subordinate provision that could not change the total amount to be sold and delivered without the consent of the parties. The delivery schedule was for the convenience of both parties. Otherwise, the contract would have provided for the delivery of the 187,500 pounds at one time. We think that the foregoing is the plain meaning of the contract.

The parties have argued at great length the meaning of the word "approximately" in connection with the delivery schedule of 37,500 pounds per year. We do not think this is controlling. Both parties agree that the billets were not always exactly the same size and did not always weigh the same. This was also true with respect to the fabricated parts. Obviously, it would have been almost impossible to have delivered *exactly* 37,500 pounds each year. The parties realized this and accordingly provided for 37,500 pounds as a delivery target or goal to be observed as nearly as possible. This is shown by the conduct of the parties in the deliveries actually made. For instance, in the above delivery chart, it is shown that in four out of the five years less than 37,500 pounds were delivered, and in only one was this amount exceeded. The practical interpretation of the contract by the parties themselves during performance, before a dispute arises, is of great importance in resolving disputes involving contract interpretation. See Blanchard v. United States, 347 F.2d 268, 171 Ct.Cl. 559 (1965); and Manufacturers Aircraft Ass'n v. United States, 77 Ct.Cl. 481 (1933), cert. denied, 291 U.S. 667, 54 S.Ct. 442, 78 L.Ed. 1057.

Under the view we take of the meaning of the contract, either of the parties could adjust any variation in observing the 37,500 pound delivery schedule in any year or years, up or down, in a later year or years of the contract period, so

as to arrive at an average of approximately 37,500 pounds per year, provided the yearly average of approximately 37,500 pounds or the total amount of 187,500 pounds to be sold and delivered under the contract was not exceeded, except by consent of both parties.

This brings us to an inquiry as to the status of the deliveries at the time the plaintiff tendered the 15,980.80 pounds to the AEC on June 20, 1962, which the AEC refused to accept. An examination of the delivery chart above shows that on that date the plaintiff had delivered 172,154.96 pounds to the AEC and its contractors, or an average of 43,038.74 pounds per year over the four-year period. Under the contract, the AEC was only required to accept approximately 37,500 pounds per year or a total of approximately 150,000 pounds over the four-year period. Under these circumstances, the AEC was justified in refusing to accept delivery of the 15,980.80 pounds tendered by the plaintiff, as the plaintiff was already 22,154.96 pounds ahead of its delivery schedule, not counting 32,622 additional pounds plaintiff had delivered to Continental for the CCC which the AEC insists should be included.

The plaintiff contends that deliveries in excess of 37,500 pounds in any year should be considered outside of the contract and for its own private account. We do not agree. There is nothing in the contract that supports or justifies this position. All deliveries to the AEC or its contractors, whether more or less than 37,500 pounds in any year, counted toward the total of 187,500 pounds to be delivered under the contract.

We conclude that the AEC was not required to accept the 15,980.80 pounds tendered by the plaintiff on June 20, 1962, and that plaintiff's claim for the rejection of such tender must be denied.

In view of our decision in the foregoing part of this opinion, the plaintiff's claim is foreclosed and it is not necessary for us to reach the second question as to whether deliveries to Continental for the CCC count as deliveries under the AEC contract. However, both parties have fully briefed and argued the question and we have decided to consider it. This question is governed by an interpretation of Modification 3 of the contract. The pertinent part of this Modification is as follows:

AGREEMENT

MODIFICATION, NOW THEREFORE, Contract No. AT(11–1)–465, as previously amended, is further amended and modified as follows:

Article II, Section 4, is deleted in its entirety and the following substituted in lieu thereof:

"4. *Allocation and Diversion of Beryllium.* All orders for the Government, or any Government contractor at any tier, for beryllium metal in any form shall be filled from current production for this contract or when and to the extent authorized or directed by the Contracting Officer, if such current production is insufficient for such purpose, through use of beryllium materials carried in Government inventory acquired or accumulated under this contract or otherwise, so long as there is any such inventory available. Such orders shall be credited against deliveries to be made under this contract as set forth in a letter dated November 6, 1959, from the Contracting Officer which is herein referenced and made a part of this contract. This letter may be revised from time to time by mutual consent of the parties without the necessity of a formal modification to this contract. The Contractor will pay to the Commission for beryllium from Government inventory the price in effect in this contract on the date the material was acquired by the Commission, or such other price as the parties hereto may agree upon. Credit arrangements and terms of payment as between the Contractor

and the purchaser for such allocated beryllium shall be satisfactory to the Contractor. Such beryllium shall be sold by the Contractor to such other purchasers at the prices and in accordance with the specifications currently in effect for beryllium delivered to the Commission and on the terms and conditions set forth in Appendix B attached hereto, unless the Contractor and purchaser agree on other terms and conditions or specifications."

The AEC held in its decision that its contract with the plaintiff covered the sales and deliveries by plaintiff to Continental for the CCC. The pertinent part of its opinion in this regard is as follows:

Contract 465 as modifed to effectuate the Commission's rights provided that "All orders for the Government, or any Government contractor at any tier, for beryllium metal in any form" were to be filled from current production for Contract 465 and credited to that contract. The Commodity Credit Corporation is an agency of the Government (15 U.S.C. 714–714p; Rainwater v. United States, 356 U.S. 590 [78 S.Ct. 946, 2 L.Ed.2d 996]; United States v. Lindsay, 346 U.S. 568 [74 S.Ct. 287, 98 L.Ed. 300]) and deliveries under the Continental contract are within the terms of Contract 465. We have considered and rejected the numerous arguments that Berylco has advanced to avoid this conclusion, since we have concluded that they are contradicted by the terms of the contract. We hold that the contracting officer was entitled to credit as deliveries under Contract 465 the deliveries to the Government under the Continental contract during the term of Contract 465.

While it is true that the AEC was correct in saying that the CCC is an agency of the government, this does not solve the problem before us. Modification 3 must be interpreted by its own language and in the light of circumstances existing at the time it was included as an amendment to the contract. Merriam v. United States, 107 U.S. 437, 441, 444, 2 S.Ct. 536, 27 L.Ed. 531 (1882). When this is done, it is apparent that Modification 3 was not meant to cover nor apply to plaintiff's sales and deliveries to Continental. This is made clear by the following:

(1) Plaintiff's contract with Continental was made *after* Modifications 2 and 3 were added to the contract.

(2) The billets to be supplied to Continental were of a higher grade of purity than that to be delivered to the AEC.

(3) The quantity to be delivered to Continental was substantially more than the undelivered remainder to be furnished the AEC.

(4) The per pound price of the metal delivered to Continental was higher than the price of that delivered to the AEC.

(5) The delivery period to Continental extended beyond the contract term of the AEC contract.

(6) Beryllium was not approved by statute for stockpiling purposes at the time Modifications 2 and 3 were executed.

(7) The CCC was not included in the surveys made by the AEC to determine the amount of beryllium needed by the government, which were made before Modification 3 was added to the contract.

(8) The AEC contracting officer knew of the negotiations leading to the barter contract between plaintiff, Continental, and the CCC, but took no steps to advise plaintiff the deliveries would be under the AEC contract.

(9) The plaintiff did not report deliveries to Continental as deliveries under the AEC contract, although it did report all AEC deliveries. The AEC contracting officer did not require the Continental deliveries to be reported to the AEC.

(10) The AEC contracting officer took no steps whatever to invoke the following price reduction provisions of Modification 2 for quantities delivered

in excess of 37,500 pounds per year in the AEC contract:

> The parties agree that in the event the quantities of beryllium metal to be delivered under this contract are increased above 37,500 pounds per year, the price to be paid for metal delivered at the new production rate will reflect a credit of $5.12 for each pound by which the contract quantity is increased up to a total of 312,500 pounds.

(11) Article XIV, Section 3a of the original contract provided:

> The contractor recognizes that the beryllium to be delivered under this contract *is to be used in equipment* to assure the common defense and security of the United States * * *. [Emphasis added.]

This provision is inconsistent with the stockpiling purposes of deliveries to Continental for the CCC.

(12) Appendix B, Section 1, to the original contract provided:

> The beryllium covered by this agreement *is for use solely and directly in the performance of work* under a contract, purchase order, or agreement between Buyer [Government contractor] and the U.S. Atomic Energy Commission or for other government use. [Emphasis added.]

It is evident no stockpiling by the CCC was included in this provision.

■ In our opinion, a proper interpretation of Modification 3, along with the original contract, compels the conclusion that it was not meant to include the deliveries of beryllium by plaintiff to Continental for the CCC as deliveries under the AEC contract. We so hold.

The decision of the AEC that deliveries in excess of 37,500 pounds per year counted as deliveries under the contract, and, accordingly, the AEC was not required to accept plaintiff's tender of 15,980.80 pounds on June 20, 1962, and dismissing plaintiff's case, is affirmed. That portion of the AEC decision holding that deliveries by plaintiff to Continental for the CCC were allocable to the AEC contract is reversed.

Although we have not based our decision on the equities in this case, we have not closed our eyes to the advantages and disadvantages resulting to the parties in the performance of the contract. The primary concern of the court is to see that justice is done. When all the facts are considered, it is clear that the plaintiff has not suffered any loss. To the contrary, it was reimbursed for the cost of its plant by the government when it was paid $1,747,000. It also received $133,000 from the government to cover other costs, making a total of $1,880,000. In addition, plaintiff sold the AEC the 187,000 pounds of beryllium called for in the contract, plus 6,692.93 additional pounds (193,692.93 pounds altogether) for $64 per pound. Also, it was able to sell 108,523 pounds to Continental for the CCC for an even higher price, because it had the production facilities that the government had paid for. Also, the 15,980.80 pounds which plaintiff tendered to the AEC and which was refused, was not a loss to the plaintiff, as it was disposed of in manufactured parts. If the government were required to pay for this tendered beryllium, it would mean that the plaintiff would be paid twice for the same metal. While we are not advised what profit plaintiff made on the beryllium it delivered, it is obvious that the entire project was a profitable one for it. We are convinced that the government more than complied with its obligations under the contract.

Plaintiff's motion for summary judgment is granted without any recovery to the extent that its deliveries to Continental for the CCC did not count as deliveries under the AEC contract, and is denied in all other respects. Defendant's motion for summary judgment is granted to the extent that plaintiff's deliveries of beryllium in excess of 37,500 pounds per year counted as deliveries under the AEC contract, and the AEC was not required to accept plaintiff's tender of 15,980.80 pounds on June 20,

1962, and is denied in all other respects, except that plaintiff's case is dismissed.

COWEN, Chief Judge (concurring in the result):

I agree with the court that plaintiff's sales to Continental for the Commodity Credit Corporation were not sales to the Government under the AEC contract. I also agree that plaintiff is not entitled to recover in this case, although I interpret the contract somewhat differently.

In my view, the contract obligated the Government to accept 187,500 pounds of beryllium, and to accept delivery at a rate of "approximately" 37,500 pounds each year. Of course, it could accept more than 37,500 pounds in any year, as it did during the third year of the contract. But the fact that plaintiff delivered more than 37,500 pounds in one year did not limit its right to deliver approximately that amount in a subsequent year, so long as the total deliveries under the contract did not exceed 187,500 pounds.

At the time plaintiff tendered the 15,-980.80 pounds in dispute, 172,154.96 pounds had already been delivered under the contract, leaving the Government still committed to accept another 15,345.-04 pounds. Plaintiff had delivered only 25,752.52 pounds during that year, and therefore it had the right to deliver an additional amount up to approximately 37,500 pounds. Since the Government was still obligated to accept 15,345.04 pounds under the contract, and since plaintiff had a right to deliver additional amounts during the year in which the Government rejected plaintiff's tendered delivery, I would hold that the Government's rejection was a breach of contract.

That breach does not mean, however, that plaintiff is now entitled to any of the damages it seeks. Plaintiff continued to deliver beryllium to the AEC, amounting to 21,537.94 pounds during the fifth year of the contract. During the entire contract period, plaintiff thus delivered 193,692.93 pounds, some 6,000 pounds more than the Government was required to accept. Plaintiff's further deliveries and the acceptance of payment therefor, after the disputed tender, resulted in what I would hold to be a waiver of the Government's breach.

Since plaintiff received all that was legally due it upon the completion of the contract, I agree that it is not entitled to recover anything in this action.

NICHOLS, Judge (concurring):

I agree with the holding of the court. Since, however, we are not obliged to pass on the deliveries to Continental to justify dismissal of the complaint, and since that issue is close and difficult for reasons that sufficiently appear in the court's opinion, I would prefer to pass over the Continental deliveries in silence. I doubt very seriously whether the AEC is in error in holding that sales and deliveries to Continental for CCC count as deliveries under its contract.

DAVIS, Judge (concurring in part and dissenting in part):

I agree with the court as to the sales to Continental for the Commodity Credit Corporation, but disagree as to the place of the contractual figure of 37,500 pounds per year. I read the agreement as obligating the Government to purchase at least "approximately 37,500 pounds" each separate year, and the plaintiff as obligated to supply at least that amount each separate year until the contract maximum of 187,500 pounds is reached, but also as permitting the plaintiff to furnish and the defendant to take more than 37,500 pounds per year if they wished. That is, the amounts tendered and taken are cumulated for the purpose of computing the total of 187,500 pounds, but nevertheless 37,500 pounds must still be delivered and taken each individual year (up to the maximum); if the contract total has not been reached, deliveries in prior years do not reduce the 37,-

500 pounds which have to be taken in a new year.[1]

My position, which seems to me to harmonize best with all the contract terms and with the parties' own practice, disagrees with the court and the Government that the 187,500 pounds figure is the only operative factor, but also disagrees with the plaintiff that all deliveries above 37,500 pounds each year are disregarded in computing the total. It appears that, on my view, plaintiff could possibly be entitled to some recovery (though not as much as it asks) if, as I think and the court holds, the CCC sales are excluded. Of course, the amount awarded would have to take account, in mitigation of damages, of sums earned by plaintiff in otherwise disposing of the metal which the Government refused to take; that is a problem, not adequately exposed before us, which I would leave to the trial commissioner.

[1]. For example, although deliveries through 1962 total 172,154.96 pounds—22,154.96 pounds more than the 150,000 minimum (37,500 × 4 years) called for in the four-year period from July 1, 1958, through June 30, 1962—the Government would not be able to credit this excess 22,154.96 pounds against the 15,345.04 pounds (187,-500 minus 172,154.96) due in the fiscal year beginning July 1, 1962.