The CINCINNATI GAS & ELECTRIC COMPANY, Petitioner,

The Toledo Edison Company, Intervenor,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Buckeye Power, Inc., and American Municipal Power-Ohio, Inc., Intervenors.

No. 82–3338.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1983.

Decided Jan. 10, 1984.

William J. Moran, Vice President & Gen. Counsel, Cincinnati Gas & Electric Co., Cincinnati, Ohio, Richard M. Merriman, Robert S. Waters (argued), John D. McGrane, Reid & Priest, Washington, D.C., for Cincinnati Gas & Elec. Co.

Robert Shapiro (argued), Jerome M. Feit (Lead Counsel), F.E.R.C., Washington, D.C., for F.E.R.C.

David R. Straus, Spiegel & McDiarmid, Washington, D.C., for American Municipal Power—Ohio, Inc.

Robert P. Mone, William R. Case, Thompson, Hine & Flory, Columbus, Ohio, for Buckeye Power, Inc.

James K. Mitchell, Reid & Priest, Washington, D.C., for Toledo Edison Co.

Before KENNEDY, ENGEL and MARTIN, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Cincinnati Gas & Electric Company (CG & E) petitions for review of an order of the Federal Energy Regulatory Commission (FERC or the Commission) requiring CG & E to transmit power generated by Buckeye Power, Inc. to the City of Hamilton, Ohio under the terms of a 1968 "wheeling" contract. CG & E contends it did not agree to deliver the power now ordered by the Commission. We agree, vacate the Commission's order and remand the case to the Commission for further proceedings.

Buckeye Power, Inc. (Buckeye) is a nonprofit cooperative that generates and transmits electricity to its member electric cooperatives in the State of Ohio. On January 1, 1968, Buckeye entered into a contract, the Power Delivery Agreement (PDA), with a number of investor-owned utilities in Ohio. These utilities, described in the

Agreement as the "Delivery Companies", included CG & E and Toledo Edison. Under the PDA, the Delivery Companies agreed that for a period of 35 years they would "wheel", *i.e.*, transmit over their own lines, power generated by Buckeye to the rural electric cooperatives that then comprised Buckeye.

According to the PDA, the Delivery Companies are required to transmit only to "Buckeye Members":

> Buckeye Members means (a) any one of the twenty-seven electric companies organized and operated not for profit on a cooperative basis which are operating in the State of Ohio at the date of this Agreement and which together constitute the present membership of Buckeye . . . , (b) any electric company similarly organized and operated which may hereafter be or become a member of Buckeye, and (c) any successor to any existing Buckeye Member or Buckeye Members except (i) a successor which is at the date of this Agreement a public utility included as such under the definition of that term contained in Section 4905.02 of the Revised Code of Ohio or which is a successor to any such public utility, or (ii) Buckeye or a successor to Buckeye, or (iii) a successor which is a political subdivision of the State of Ohio or a municipal corporation, bureau or department organized by or serving any such political subdivision or any governmental agency or any successor to any of the foregoing.

When the Agreement was signed and continuing until about 1979, the Buckeye Members that comprised Buckeye Power all served retail customers in well-defined areas devoted to agriculture and agri-business. Most members had been operating since the 1930s, and all were eligible for low-cost financing through the Rural Electrification Administration. All members owned physical facilities for distributing electrical energy to their customers.

In addition to limiting who could receive the electricity wheeled under the Agreement, the Agreement also restricted the power delivered to the "Buckeye Power Requirement." Under Article One, 1.1, the "Buckeye Power Requirement" is the aggregate requirements of power sold to Buckeye Members that (a) is ultimately consumed in the State of Ohio and (b) is not prohibited by the Ohio anti-pirating statute then in effect [Section 4905.26.1, Revised Code of Ohio, since repealed]. Under Ohio's anti-pirating statute, a utility could complain when another utility proposed to provide service to a consumer, if the consumer was already receiving adequate service and if the second utility would duplicate the first utility's facilities.

Under the Agreement, Buckeye pays for the transmission service provided by the Delivery Companies, not according to actual use, but based on Buckeye's highest historical demand on the system during the term of the Agreement. Since the Buckeye Member cooperatives largely serve rural customers, the power demand peaks in winter. Buckeye pays the same rate all year; thus, during off-peak periods it pays for unused transmission capacity. Accordingly, Buckeye sought a way to acquire additional non-rural customers, who could utilize this idle off-peak transmission capacity, which Buckeye could provide at no additional cost to itself. A new Buckeye Member was established, The Buckeye Member Cooperative, Inc. (BMCI), to serve as a conduit for marketing this off-peak transmission capacity which Buckeye was entitled to use. BMCI owns no physical facilities and has no defined service territory. Instead, it is a paper entity formed to simplify sales of electricity to municipalities. Without BMCI, individual member cooperatives would have to negotiate and contract to sell power to municipalities, include the municipalities' power requirements in their own power reservations with Buckeye, bill the municipalities, and maintain reserves to cover late payments. With the creation of BMCI these details of selling to municipalities can be handled for the cooperatives as a group and any profits on sales to these municipalities benefit all members.

BMCI was organized as a not-for-profit cooperative; its members include Buckeye,

the rural electric cooperatives that were the original Buckeye Members, and American Municipal Power-Ohio, Inc. (Amp-Ohio). Amp-Ohio, a not-for-profit corporation, was created by Ohio municipal electric systems to locate and develop power supplies for them. Amp-Ohio is presently the only customer-member of BMCI.

In January 1979, Buckeye requested CG & E pursuant to the Agreement to establish a new delivery point at the City of Hamilton, Ohio, for transmitting power to BMCI, as a Buckeye Member. Under this plan, BMCI would then sell the power to Amp-Ohio, which would resell it to the City of Hamilton, a member of Amp-Ohio. Hamilton's municipal electric system is largely self-sustaining, but has purchased its supplemental electric power in the past from CG & E. CG & E refused to wheel power for BMCI to Hamilton under the PDA, but offered to negotiate a separate contract for the transmission.

Buckeye then filed this complaint with the FERC against CG & E, alleging that CG & E had violated the PDA by refusing to provide transmission service for BMCI. In its answer, CG & E claimed that the Agreement did not require it to transmit power for the Hamilton transaction, and moved to dismiss the complaint. Later, Amp-Ohio and Toledo Edison moved to intervene.[1]

On January 7, 1980, the FERC issued its Order Denying Dismissal of Complaint, Establishing Procedures and Granting Interventions. The Commission agreed, on the basis of the pleadings, that the parties to the PDA did not originally intend that the Agreement would apply to transactions like the proposed Hamilton venture, but added that the restrictions in the Agreement were probably invalid unless Buckeye could establish a non-anticompetitive reason for them.

Following hearings, the Administrative Law Judge issued an Initial Decision on January 9, 1981. The PDA was found to apply in principle to the Hamilton transaction; however, the ALJ held that BMCI was not a legitimate Buckeye Member.

Therefore, CG & E could be required to transmit Buckeye's power to Hamilton only if the load were delivered to a bona fide Buckeye Member, like the neighboring Butler Rural Electric Cooperative, Inc., one of the original cooperatives that comprised Buckeye.

Upon review of the Initial Decision, the Commission affirmed the ALJ's holding that the Hamilton transaction was covered by the PDA, but reversed his finding that BMCI was not a Buckeye Member. Instead, the Commission held that BMCI satisfied the contractual requirements for a Buckeye Member, and therefore ordered CG & E to transmit power under the agreement from BMCI to Amp-Ohio at Hamilton.

■ CG & E argues that the Power Delivery Agreement does not require it to wheel power to Hamilton, both because the party requesting the power, BMCI, is not a Buckeye Member, and because the shipment would violate the anti-pirating statute were it still in effect and therefore violates the anti-pirating clause of the Agreement and falls outside the Buckeye Power Requirement. This Court's role in judging CG & E's challenges to the Commission's order is limited by the Federal Power Act: "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure to do so." 16 U.S.C.A. 825*l*(b) (1974). Moreover, a court has no jurisdiction to consider an issue *sua sponte* if it was not "urged" in the rehearing application. *Federal Power Commission v. Colorado Interstate Gas Co.,* 348 U.S. 492, 498–99, 75 S.Ct. 467, 471, 99 L.Ed. 583 (1955); *Rhode Island Consumers' Council v. Federal Power Commission,* 504 F.2d 203, 212 (D.C.Cir.1974).

Buckeye urges that CG & E failed to argue before the Commission that the proposed sale would violate the anti-piracy provision of the Agreement. Before the Commission Buckeye mentioned the provision only twice and neither time was there any

---

1. Toledo Edison is one of the Delivery Companies under the PDA.

explicit argument. However, in view of our disposition of the merits, we need not decide whether the issue was sufficiently raised or whether the failure to more explicitly raise it was excusable.

We turn then to the issue of whether BMCI was entitled to wheeling under the PDA as a Buckeye Member.

In its opinion, the Commission held that BMCI qualified as a Buckeye Member. This holding was based entirely on ·the Commission's interpretation of the language of the Agreement defining "Buckeye Member." We are not persuaded by the Commission's interpretation and find that BMCI is not a Buckeye Member as defined in the PDA.

 In reviewing the Commission's interpretation of the language of the Agreement, we are not bound to defer to the FERC's determination. Under general contract law, interpretation of a contract is a question of law, not fact. *E.g., Pennsylvania Avenue Development Corp. v. One Parcel of Land in the District of Columbia,* 670 F.2d 289, 292 (D.C.Cir.1981); *Clayman v. Goodman Properties, Inc.,* 518 F.2d 1026, 1034 (D.C.Cir.1973); *Beryllium Corp. v. United States,* 449 F.2d 362, 366, 196 Ct.Cl. 12 (1971). "Questions of law, unlike questions of fact, are freely reviewable by the court." *Coca-Cola Co. v. Atchison, Topeka, and Santa Fe Railway Co.,* 608 F.2d 213, 218 (5th Cir.1979); *see First National Bank in Sioux Falls v. National Bank of South Dakota,* 667 F.2d 708, 711 (8th Cir.1981) (in reviewing agency decisions of questions of law, court "can determine such questions de novo"); *Rosen v. NLRB,* 455 F.2d 615, 617 (3d Cir.1972). An agency's interpretation of a contract, therefore, may be reviewed by a court without special deference. *See Beryllium Corp.,* 449 F.2d at 366; *Swearingen Aviation Corp. v. NLRB,* 568 F.2d 458, 463 (5th Cir.1978) ("Where . . . the crucial issue is the legal significance of a written statement, neither the statute authorizing review nor respect for the Board's expertise . . . limit our review." (footnote omitted)). It should be noted that courts do defer to contract interpretations based upon an

agency's factual findings or technical expertise. *See Columbia Gas Transmission Corp. v. Federal Power Commission,* 530 F.2d 1056, 1059 (D.C.Cir.1976); *Gulf States Utilities Co. v. Federal Power Commission,* 518 F.2d 450, 457 (D.C.Cir.1975). In this case, however, where the FERC based its decision on the language of the Agreement rather than any factual or technical grounds, this Court need not defer to the Commission's interpretation but can review it freely.

 The Agreement defines a Buckeye Member as "(a) any one of the twenty-seven electric companies organized and operated not for profit on a cooperative basis which are operating in the State of Ohio . . ., (b) any electric company similarly organized and operated . . . ." From this language, the FERC reasoned, "The Agreement defines Buckeye Members as '. . . companies *organized and operated not for profit on a cooperative basis,'* or any other *similarly organized and operated.*" (emphasis added in FERC order 1–25–82). Assuming that the underlined portions referred to each other, the Commission concluded that "similarly organized and operated means similarly organized and operated on a not for profit, cooperative basis in the State of Ohio." Since BMCI meets those qualifications, the Commission held it was a Buckeye Member.

This interpretation of the definition of "Buckeye Member" focuses too narrowly. The FERC, in excerpting from the Agreement, omitted important language that further characterized Buckeye Members. The PDA did not state that Buckeye Members were defined as *any* companies that were operated not for profit and organized as cooperatives or were operated and organized in a similar way. Instead, the Agreement defined Buckeye Members as "any one of the twenty-seven electric companies," which were operated and organized as not for profit cooperatives, and "any electric company similarly organized and operated." The twenty-seven electric cooperatives that became the original Buckeye Members formed a homogenous group with

many similarities of organization and operation. BMCI conspicuously lacks characteristics shared by all the original Buckeye Members. As the Commission noted in its opinion, BMCI owns no physical facilities for distributing electric energy, has no defined service area, and was established merely as a conduit for selling Buckeye power to municipalities. The original cooperatives served large, primarily rural, retail loads; BMCI has only one customer, an agent for a municipality. The original cooperatives had many members, most of whom were customers; only one of BMCI's twenty-eight members is a customer. In fact, the only thing that BMCI shares with the original Buckeye Members is its formal structure as a not-for-profit cooperative. Given the substantial similarities among the original Buckeye Members that are lacking in BMCI, we hold that mere formal similarity in the manner in which BMCI is legally organized is not enough to permit the Commission to find that it is a Buckeye Member under the Agreement.

As the facts of this case illustrate, the Commission's interpretation of the definition of "Buckeye Member" would deprive the restrictions in that provision of any impact. The Delivery Companies could be required under the PDA to transmit power to any customer of Buckeye, as long as a not-for-profit cooperative is employed as an intermediary. In the instant case, the FERC ordered CG & E to transmit power to Hamilton for BMCI, but BMCI is merely a paper entity whose interposition does not affect the realities of the transaction. It is axiomatic that a court in its interpretation should attempt to give meaning to all the provisions of a contract. *See, e.g., Petrofsky v. United States,* 616 F.2d 494, 503, 222 Ct.Cl. 450 (1980), *cert. denied,* 450 U.S. 968, 101 S.Ct. 1488, 67 L.Ed.2d 618 (1981); *Union Investment Co. v. Fidelity & Deposit Co.,* 549 F.2d 1107, 1110 (6th Cir.1977) (decided under Michigan law); *Fitch v. Doke,* 532 F.2d 115, 117 (8th Cir.1976). Moreover, it cannot be reasonably concluded that the parties intended to create a restriction that could be evaded so easily. On the contrary, the only reasonable interpretation of the

definition in view of all the language of the Agreement, is that subsequent Buckeye Members must have an organization and operation similar to the organization and operation of the original electric cooperatives in substance as well as form. Under this interpretation, BMCI is not a Buckeye Member. Since this transaction is not within the PDA, the Commission was mistaken in ordering CG & E to wheel power for Hamilton. *See New York State Electric & Gas Corp. v. FERC,* 638 F.2d 388 (2d Cir. 1980), *cert. denied,* 454 U.S. 821, 102 S.Ct. 105, 70 L.Ed.2d 93 (1981).

In coming to this conclusion, we agree with the ALJ who heard this case and held that "merely operating on a not-for-profit basis and in accordance with basic cooperative principles is not sufficiently akin to the operation of the original cooperatives to satisfy the definition of 'Buckeye Member'." Although the ALJ therefore found that BMCI did not qualify as a Buckeye Member, he noted that Buckeye could still arrange the same transaction through the use of a bona fide Buckeye Member, such as Butler Rural Electric Cooperative, Inc., one of the original members, whose service area is near Hamilton. The Commission, Buckeye, and Amp-Ohio have all argued that, because service could be requested under the PDA by Butler or another valid Buckeye Member, there is no harm in holding BMCI a Buckeye Member and permitting it to request service. This Court's role is limited to review of the Commission's decision. Until a bona fide Buckeye Member such as Butler requests wheeling under the PDA, and CG & E refuses, and that request is passed upon by the Commission, the issue is not before this Court for review. It may be that individual cooperatives will not wish to make such a request or that Buckeye Members may not wish individual cooperatives to do so.

Because the FERC rejected the ALJ's holding that BMCI was not a Buckeye Member, it did not pass upon rate issues which the ALJ had considered and which arise only if service is not required under the PDA. Since we now decide that the

contractual requirements are not satisfied by the employment of BMCI, those issues are again relevant. Therefore, we remand this case to the Commission for further consideration of those issues.