**NORTH STAR ALASKA HOUSING CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–88C.

United States Court of Federal Claims.

Dec. 22, 1993.

**264**

John Spencer Stewart, Washington, DC, attorney of record, for plaintiff. Donald P. Young, David B. Stinson, Saul, Ewing, Remick & Saul, and Stafford, Frey, Cooper & Stewart, of counsel.

Donald E. Kinner, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, attorney of record, for defendant. David M. Cohen, Director, Mary Mitchelson, Deputy Director, and Abigail F. Dunning, Deputy Dist. Counsel, U.S. Army Engineer Dist., Anchorage, AK.

### OPINION AND ORDER

FUTEY, Judge.

This contract case is before the court on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. Plaintiff is North Star Alaska Housing Corporation ("NSAHC"), an Alaskan corporation with its principal place of business in Seattle, Washington. Defendant is the United States of America, acting through officials representing the Secretary of the Army and the Chief of the Army Corps of

Engineers. Plaintiff is suing defendant for breach of contract on 10 separate counts.

### Facts

In February 1985, defendant, the United States Army Corps of Engineers ("COE"), issued a Request for Proposals ("RFP") No. DAC85–85–R–0019, for the design and construction of 400 units of Section 801 Build-to–Lease On–Base Family Housing at Fort Wainwright, in Fairbanks, Alaska. Plaintiff submitted a proposal and was awarded the procurement on December 31, 1985.[1] Initially, defendant leased the land located on Fort Wainwright to plaintiff.[2] The "Outlease" is for a term of 32 years, beginning on June 27, 1986, and terminating on June 26, 2018. Under the "Agreement to Lease," defendant contracted also with plaintiff to lease back the property with family housing units and other improvements added. This contract became effective on June 17, 1986.[3] The parties also entered into an "Interim Lease" to lease residential units as they became ready for habitation and before final acceptance of the entire project. When construction was complete, defendant and plaintiff executed a "Permanent Lease" on November 6, 1987, for the land and the improvements, that will run for a term of 19 years and 6 months. After the expiration of the Permanent Lease, defendant has the first right of refusal to continue renting the property with improvements until June 6, 2018. If defendant does not exercise its option, plaintiff is free to lease the property for the remaining term of the Outlease to the general public.

Under the terms of the contract, defendant agrees to rent all 400 units for 19 years and 6 months and contracts with plaintiff for different maintenance and operational services. Payment for housing is "shelter rent," while payment for services is considered "maintenance rent." The contract obligates defendant to pay the rates and charges for the utilities it uses during the full term of the lease.

All certified claims submitted by plaintiff to the contracting officer (CO), pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.* (1988), have either been denied or deemed denied. Plaintiff then properly filed the instant case with this court claiming breach of contract. Plaintiff moves for summary judgment and defendant counters with a cross-motion for summary judgment. Oral argument was held on September 30, 1993.

### Discussion

**I. Summary Judgment**

■ Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS,* 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988); *Jay,* 998 F.2d at 982. If the moving party demonstrates an absence of genuine issues of material fact, then the burden shifts to the non-moving party to show that a genuine factual dispute does exist. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show that there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2533.

---

1. Section 801 of Pub.L. No. 98–115, Military Construction Authorization Act of 1984, *amending* 10 U.S.C. § 2828 (1988).

2. Contract No. DACA85–1–86–11 for the Outlease land was entered under the authority of 10 U.S.C. § 2667 (1988).

3. The Agreement to Lease, contract No. DACA85–9–86–27, was executed under the authority of 10 U.S.C. § 2828 (1988), *as amended by* § 801 of Pub.L. No. 98–115.

■ The court must resolve any doubts about factual issues in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987); *Litton Industrial Products, Inc. v. Solid State Systems Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences run. *Jay*, 998 F.2d at 982; *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The fact that both parties have moved for summary judgment, does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988). Summary judgment will not necessarily be granted to one party or another, just because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (*citing LewRon Television, Inc. v. D.H. Overmeyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judgment. It does not follow, however, that if one motion is rejected the other is necessarily supported. The court must evaluate each party's motion on its own merit, and resolve all reasonable inferences against the party whose motion is under consideration. *Corman*, 26 Cl.Ct. at 1014.

## II. *Refuse Collection*

■ The parties disagree as to who is responsible for the payment of refuse collection on the Fort Wainwright base. Defendant is obligated to pay for utilities under Article VI, "Utilities, Rates, Charges, Taxes and Assessments," of the Lease, which provides that "the Government shall pay all rates and charges which may become payable for water, sewer, gas, electric current, oil or other form of power, fuel, or utility used or utilized by the Government on the leased premises during the full term of the Lease."

Plaintiff argues that Alaska law, § 42.05.-990(4)(F) (1993), defines refuse collection service as an "utility" or "public utility":

"Public utility," or "utility" includes every corporation (whether public ... or otherwise) ... that owns, operates manages or controls any ... system for ... furnishing collection and disposal service of garbage, refuse, trash or other waste material.

Furthermore, plaintiff also cites to Fairbanks Code of Ordinances, § 12.208(b) which states that the city of Fairbanks:

[H]as undertaken the collection of garbage, rubbish and ashes in the residential areas of the city....

Plaintiff interprets these laws to mean that refuse collection on Fort Wainwright, which is located in a "residential area" in the city of Fairbanks, is an utility.

In addition, plaintiff points out that Fairbanks charges each resident a fee for refuse collection whether or not the resident uses the garbage service. Plaintiff cites to Article VIII, "Maintenance, Repair and Operational; Standards Annex," the Lease which states:

The developer is responsible for ... all operations required to support the housing site ... insofar as such responsibilities are not normally undertaken by governmental authorities.

Therefore, plaintiff maintains that because the city of Fairbanks has assumed responsibility for refuse collection, plaintiff is relieved of that obligation under the contract.

Neither party disputes that the government is responsible to pay for utilities. Plaintiff claims that the list, water, sewer, gas, electric current, oil or other form of power, fuel, or utility used or utilized by the government, is not all-inclusive and is open to incorporate other unenumerated utilities. Because garbage collection is defined as an utility under the Alaskan state statutes, plaintiff insists that it should also be construed as such under the contract. Plaintiff concludes that, although it is responsible to arrange for the service, if garbage collection is an utility, then defendant must incur the expense.

Defendant argues that all of the documents which define the parties' relationship,

*i.e.,* the RFP, the Agreement to Lease, the Outlease, the Interim Lease, and the Permanent Lease, clearly and consistently refer to refuse collection as a maintenance and operational responsibility of the developer. Defendant states that refuse collection is never expressly defined as an utility, and to interpret it as an unspecified utility is not reasonable.

Defendant first points out that maintenance and operational services are listed *separately* under the contract and that those sections specifically cite refuse collection as plaintiff's responsibility. Furthermore, defendant argues that plaintiff cannot rely on an extrinsic state statute to modify the agreement. Because Alaska defines refuse collection as a public utility, which is regulated by the Alaska Public Utilities Commission (APUC), defendant agrees that plaintiff may arrange for the city to collect garbage at Fort Wainwright. Defendant argues that providing refuse removal through the Fairbanks Municipal Utility Systems (FMUS), operated by the city of Fairbanks, to fulfill its maintenance and operation obligation, however, does not allow plaintiff to shift the cost of the service to the government.

 The construction of an unambiguous writing is an appropriate matter for summary judgment. *National Rural Utilities Cooperative Finance Corp. v. United States,* 14 Cl.Ct. 130, 136 (1988), *aff'd,* 867 F.2d 1393 (Fed.Cir.1989). On a summary judgment motion, a question of law must be resolved by the court where the written contract's construction is determined by the document's plain and unambiguous language. *Id.* at 136; *Ceccanti, Inc. v. United States,* 6 Cl.Ct. 526, 528 (1984).

 Essentially, plaintiff argues that Alaska's definition of refuse collection as an utility should apply to this contract because defendant did not draft an all inclusive list of utilities. An item, however, included on a list will be qualified and limited to the words which it is associated. Fittingly stated in *C.W. Roberts Construction Co.,* ASBCA 12348, 68–1 BCA ¶ 6819 (1968), "words, like men, are known by the company that they keep." *Webster's Dictionary* (2nd ed.), defines "Utility" as a service that is provided to the public, such as electricity or water. The enumerated utilities under the contract are "water, sewer, gas, electric current, oil, or other forms of power or fuel." In general, these utilities are chemical or physical "elements." They are products that are essential to a home which provide necessities such as heat and electricity. Refuse collection, although essential, does not logically flow from a list delineating gas, oil and water. It is not a traditional form of utility. As a matter of fact, neither party could cite to another state which defines refuse collection as an utility. Other than Alaska's statute, plaintiff advances no reasonable explanation of why the list should be expanded to include refuse collection.

 Even if the court were to accept that refuse collection could reasonably be included on the list of utilities, plaintiff's interpretation still ignores other sections of the contract which *expressly* define refuse collection as an "operational service." A contract must be read as a whole when interpreting different provisions. *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 979 (1965). Provisions must be read harmoniously, and not conflicting, to avoid rendering any portion of the contract meaningless. *Unicon Management Corp. v. United States,* 179 Ct.Cl. 534, 537, 375 F.2d 804, 806 (1967). Moreover, where general and specific provisions are inconsistent, the specific contract provision will prevail. *Hol–Gar Mfg. Corp.,* 169 Ct.Cl. at 388, 351 F.2d 972. The contract between plaintiff and defendant provides numerous instances where refuse collection is classified as an operational service. Under the Agreement to Lease, Exhibit B: Design and Construction Criteria, a pertinent provision provides:

 c. *Development Services:*

 1. *Fire Protection.* Fort Wainwright will provide fire protection for the development *at no cost to the developer.*

 2. *Police Protection.* Fort Wainwright will provide Police protection for the development *at no cost to the developer.*

 3. *Garbage collection/disposal. Developer is responsible.*

[Emphasis added.]

 Both references to fire and police protection, designate that defendant will be

**268**

responsible *and* will also pay for those services. Where the section addresses garbage collection, however, the contract denotes that the "developer is responsible." The logical interpretation, therefore, is that the developer is both responsible to arrange for refuse disposal *and* must pay for the service as well.

■ During oral argument, plaintiff explained that at one time defendant believed that garbage would be disposed of on-site.[4] Plaintiff stated that the portion of the contract under "Development Services" was a generic section of the contract that is no longer applicable because garbage is not disposed of on-site.[5] This explanation, however, is not corroborated by any other evidence. Moreover, this section is still included in all the contract documents of record and, therefore, will not be considered null and void without any further evidence indicating a modification. Therefore, regardless of whether garbage was disposed of on-site or off-site, this section provides substantive evidence that plaintiff's responsibilities included arranging *and* paying for refuse collection.

The contract includes other sections which shoulder responsibility on plaintiff to pay for refuse collection. Under the Lease, a section entitled, *C. RESPONSIBILITIES* states:

1. [D]eveloper responsibilities

> \* \* \* \* \* \*

(r) *Operational Services.* The developer is responsible to provide, or arrange for the provision of, operational services for the housing site, as described elsewhere in this annex. The services are to include entomological, janitorial, *refuse collection,* street cleaning, and snow removal services. [Emphasis added.]

In another section of the contract, refuse collection is discussed again. This provision specifically deals with "operational services."

G. Standards for Provision of Operational Services:

The operational services provided shall be evaluated against the standards contained herein to determine deficiencies requiring correction.

1. *Refuse Collection:* The developer shall ensure that refuse is collected twice weekly with three days between collections unless it is controlled by the local municipality. Refuse refers to garbage and trash generated by the occupant and government within the housing site and includes bulk items. . . . The Developer shall notify the Government, at the time of the pre-performance conference, as to how refuse will be collected and what will be required of occupants with respect to the placement of refuse

■ Plaintiff's analysis creates inconsistencies within the contract. The contract specifically and expressly classifies refuse collection as an operational service. Furthermore, refuse collection is entirely separate and independent from the section which discusses utilities. Plaintiff bears the burden of proving its alternate interpretation of the contract is a reasonable one, and this it has not done. *M.A. Mortenson Co. v. United States,* 843 F.2d 1360, 1362 (Fed.Cir.1988). It is unreasonable to define refuse collection as an operational service under one section of the contract and also define it as an utility under another section. If a specific provision of the Lease did not refer to refuse collection, and list it as an operational service, plaintiff's position may have carried more weight. The contract, however, expressly classifies refuse collection as an operational service and not an utility.

■ Assuming, arguendo, that plaintiff's reading of the contract is reasonable, a problem still exists. Plaintiff interprets refuse collection as an utility under the contract, while defendant interprets it as an operational service. A contract is ambiguous when it is reasonably susceptible to more than one interpretation. *Tibshraeny Bros. Constr., Inc. v. United States,* 6 Cl.Ct. 463, 468 (1984). Ambiguities in a contract must be classified as either patent or latent. A latent ambiguity is a concealed defect which is not apparent, and could not be discovered by reasonable inspection of the document. A patent ambiguity is a defect that is readily

---

4. Oral Argument Transcript (Tr.) p. 28.

5. *Id.*

apparent and gives rise to a duty of the contractor to bring the discrepancy to the government's attention and to inquire as to what is the government's intent. *B.D. Click Co. v. United States*, 222 Ct.Cl. 290, 299, 614 F.2d 748, 753 (1980); *Industrial Indemnity Co. v. United States*, 14 Cl.Ct. 351, 358 (1988). Plaintiff defines refuse collection as an utility under the contract because the list of utilities was not limited to the enumerated items. The contract, however, explicitly *labels* refuse collection as an operational service. The fact that the contract expressly discusses refuse collection separately from utilities, leaves a "patent and glaring" discrepancy in plaintiff's interpretation, and that imposed an affirmative duty on plaintiff to seek clarification. *Avedon Corp. v. United States*, 15 Cl.Ct. 771, 777 (1988). Therefore, refuse collection is plaintiff's responsibility under the contract, and plaintiff must arrange for the collection and pay for the service.

III. *Vandalism*

Acts of vandalism have sporadically occurred on the Fort Wainwright Base. Under the contract, defendant is responsible to pay for the repairs when malicious damage to property on base is caused by occupants, their guests, or government officials. Defendant, however, refuses to reimburse plaintiff for these claims. Defendant avers that plaintiff has not provided sufficient evidence to prove that occupants, their guests or government officials have vandalized property on Fort Wainwright.

In the RFP dated February 1985, defendant inserted a clause as follows:

*DAMAGES CAUSED BY OCCUPANTS.* Damages to a housing unit or to other improvements within the project which are beyond normal wear and tear and are caused by the government or an occupant, his [sic] dependents, or invited guests, which are not corrected by government or occupants, shall be repaired by the developer. The cost of such repairs shall be billed to the government. Under no circumstances shall the developer negotiate or settle reimbursement of costs for such repairs directly with occupant, his dependents or invited guests. Repair of damages which occur to the units or other improvements that cannot be attributed to the government, his agents, officers, occupants, their dependents, or invited guests, *as determined by the government,* shall be accomplished by the developer at no cost to the government. [Emphasis added.]

The Permanent Lease dated November 6, 1987, contained the same clause, but it did not include the line "as determined by the government." Accordingly, the clause contained in the lease reads as follows:

*DAMAGES CAUSED BY OCCUPANTS.* Damages to a housing unit or to other improvements within the project which are beyond normal wear and tear and are caused by the government or an occupant, his [sic] dependents, or invited guests, which are not corrected by government or occupants, shall be repaired by the developer. The cost of such repairs shall be billed to the government. Under no circumstances shall the developer negotiate or settle reimbursement of costs for such repairs directly with occupant, his dependents or invited guests. Repair of damages which occur to the units or other improvements that cannot be attributed to the government, his agents, officers, occupants, their dependents, or invited guests shall be accomplished by the developer at no cost to the government.

Defendant's briefs, however, continually include "as determined by the government," when referring to this clause. During oral argument, defendant once again contended, that it is the government who determines whether malicious damage has been caused.[6] When questioned about the discrepancy between the RFP and the Permanent Lease, defendant could not articulate a reason.[7]

The difference between the two clauses indicates that the change of wording may have been bargained for by plaintiff. Moreover, the modification is crucial to the final determination of this issue. If responsi-

---

6. Oral Argument Tr. p. 70.

7. *Id.*

bility for repair is "determined by the government," then the court has nothing to decide. The government has already determined that it was not responsible for the damage and plaintiff would have to bear the costs of repair. The court recognizes, however, that the parties have continually modified their agreements, culminating in the Permanent Lease. Therefore, this issue will be interpreted according to the wording used in the Permanent Lease. Thus, it is up to the court to determine liability for vandalism repair costs rather than defendant.

Defendant argues that plaintiff provided insufficient evidence to prove that the cause of vandalism at Fort Wainwright was "the government, his [sic] agents, officers, occupants, their dependents, or invited guests." Plaintiff believes there is nothing to prove. Because Fort Wainwright is a closed post which restricts public access, plaintiff avers that the only people on base are "the government, his [sic] agents, officers, occupants, their dependents, or invited guests."

Defendant concedes that the general public cannot gain access to Fort Wainwright. Government security guards stand at the front gate at Fort Wainwright at all times. An individual wishing to enter the base must stop and present identification and state a *reason* for their visit. Presumably, anyone who does not have a legitimate purpose to enter the base will be denied access.

■ Because the guards (agents of the government) grant visitors, delivery people, etc., permission to enter the base, they are classified as either licensees or invitees. As defined by *Black's Law Dictionary* 830 (5th ed. 1979), a *licensee* is a person who has a privilege to enter upon land arising from permission or consent, express or implied, but who goes on the land for his own purpose rather than any purpose or interest of the possessor. An *invitee* is a person who enters land by invitation either express or implied or a person whose entry is connected with

the owner's business or activity. *Id.* 742. Therefore, depending on the nature of their visit, these individuals are categorized as licensees or invitees *of the government or the occupants*. Thus, as an agent of the government or the occupants, any damage caused by a licensee or an invitee is attributable to defendant.

■ Defendant maintains that plaintiff has not witnessed the vandalism as it occurs. The court recognizes, however, that if the only individuals on Fort Wainwright are defendant, its agents, occupants, and their agents (*i.e.*, licensees or invitees), then the actual "identity" of the perpetrator is irrelevant for purposes of assessing responsibility for repair payment.

■ Defendant also asserts that individuals may gain access to Fort Wainwright through two pedestrian gates, "in the vicinity of the section 801 housing project which are unguarded and open for the convenience of school students and other pedestrians." [8] Defendant contends that individuals committing vandalism could be entering Fort Wainwright through these gates. Therefore, these people are trespassers [9] and would not be "agents" of the government or the occupants.

■ Even though Fort Wainwright is a restricted guarded post, defendant deliberately kept two pedestrian gates open for school children and pedestrians. Therefore, the school children and pedestrians are not trespassers who intentionally enter Fort Wainwright without consent or privilege. Instead, they are licensees who enter Fort Wainwright for their own purposes, with the permission, or at the very least the implied consent, of defendant. Again, any damage these individuals cause is attributable to defendant.

■ Furthermore, defendant is still responsible even if people are slipping through the unguarded gates at Fort Wainwright

---

**8.** There is a dispute as to when these gates came into existence. This date, however, is not necessary for purposes of this analysis.

**9.** Trespasser is defined as one who intentionally and without consent or privilege enters another's

property. One who enters upon property of another without any right, lawful authority, or express or implied invitation, for his own purpose, pleasure or convenience. *Black's Law Dictionary* 1348 (5th ed. 1979).

only to commit acts of vandalism. Because defendant chose to leave these gates unguarded, it assumed the risk that acts of vandalism would be committed by malicious individuals. *Proctor Wholesale Co. v. United States,* 215 Ct.Cl. 1049, 578 F.2d 1388 (1978) (taking "no action" to restrain access by third persons to property was "conducive to vandalism," and party held liable for costs); *cf. Union Petroleum Corp. v. United States,* 228 Ct.Cl. 54, 73, 651 F.2d 734, 745 (1981) (taking sufficient steps to "forestall vandalism" avoids liability). Plaintiff did not participate in the government's decision to leave an area of the base open, and cannot prevent unwelcome visitors from entering the unguarded gates. Therefore, the repair costs for damage caused by these individuals is also defendant's responsibility.

The court cannot fault plaintiff for something beyond its control. Whether or not plaintiff actually witnessed the malicious acts, it is nearly impossible that they were committed by anyone who is not either an occupant, or an occupant's guest or an agent of the government. Plaintiff has neither say nor authority to make security decisions for Fort Wainwright. Defendant chose to leave an area of the base open and unguarded, and, therefore, must assume the consequences of this decision. Thus, defendant must reimburse plaintiff for the cost of repairs of vandalism at Fort Wainwright.

## IV. *On–Site Representative*

Plaintiff argues that defendant is obligated under the contract to have an on-site manager at Fort Wainwright. Plaintiff cites to two Lease provisions to support this contention. Under "Developer Responsibilities" the contract provides:

> *On–Site Facilities for Government Use:* The Developer will provide a minimum of 400 square feet of office space and operational facilities for the sole use of the Government....

Then in another section labeled "Government's Responsibilities" the contract provides:

> *Designation of Housing Project Manager and/or Staff:* The Government shall designate, by name and position title, the hous-

ing project manager and staff who will be responsible for the day-to-day administration of the Government's responsibilities with respect to this lease separate from lease administration functions.... The housing manager shall serve as the primary point of contact for matters involving the day-to-day coordination and administration of the Government's responsibilities.

Day-to-day administration responsibilities at the housing site were specifically itemized. Some of these duties included:

1. Establish and disseminate rules and regulations governing occupancy of the units.

2. Ensure occupant compliance with all rules and regulations.

3. Handle all matters involving occupancy of units, including the mediation of all complaints or disputes between occupants.

4. Provide list of occupant names and phone numbers, by address, to Developer as soon as possible but no later than 30 days of beneficial occupancy date and revise monthly thereafter.

Plaintiff argues that the culmination of these three provisions requires defendant to provide a housing project manager *on-site* responsible for daily administration. Plaintiff states that it complied with the contract and built an on-site facility to house the project. Apparently defendant, however, has not furnished an on-site manager and staff. Instead, defendant attempts to deal with problems that occur at Fort Wainwright in an Army office located approximately 3 miles away. Plaintiff complains that, as a result, it has had to take responsibility for the day-to-day administration. Part of the trouble, plaintiff avers, is that the problems which occur *on* base, cannot be addressed by an office that is located 3 miles away. Plaintiff states that the tasks it had to handle in place of the government included, enforcing compliance with Army rules and regulations, mediating of complaints between tenants, and revising and maintaining an up-to-date list of occupant names and telephone numbers.

■ There is no doubt that the services plaintiff performed were intended to be defendant's responsibility under the Lease. The issue is, however, why plaintiff took over the responsibilities and whether defendant is now obligated to reimburse plaintiff for its time. Defendant contends that under the contract plaintiff was not obligated to perform this work and, therefore, plaintiff acted at its own peril and cost when it took such action.

■ A contractor who acts as a volunteer will not be paid for services furnished on its own initiative. *Calfon Construction Inc. v. United States,* 17 Cl.Ct. 171, 177 (1989). When the contractor elects to perform as a matter of its own free choice and without a formal change order, there is no valid claim for extra work without proof that the contract requirements were enlarged and that the additional work was not volunteered. *Calfon,* 17 Cl.Ct. at 177; *Len Co. & Associates v. United States,* 181 Ct.Cl. 29, 38–9, 385 F.2d 438 (1967); *Portable Rock Product Co. v. United States,* 4 Cl.Ct. 495, 504–05 (1984). While it is true that plaintiff was not contractually bound to perform the specified administrative tasks, it had more at stake than just an innocent bystander donating its services. As evidenced by plaintiff's claim of continued vandalism, there is a need for an on-site administrator to deal with tenants and enforce Army rules on a daily basis. If, for example, occupants were acting in a way that required immediate action, plaintiff could not be expected to stand by idly and risk further damage to the property which it was constructing. If plaintiff mitigated conflicts between tenants rather than allowing disagreements to escalate to acts of violence and vandalism, those actions were not hastily volunteered. The court does not find that the contract was modified to change plaintiff's obligations. It is obvious, however, that plaintiff acted in a reasonable manner when it took over defendant's responsibilities. If defendant is not available to arbitrate disagreements at Fort Wainwright, plaintiff has no choice but to act in defendant's place. Plaintiff did not volunteer its services, instead it acted responsibly and avoided unnecessary friction between tenants, as well as unnecessary damage to property at Fort Wainwright. The government should also reimburse plaintiff for the maintenance of the Occupancy List which was necessary for operations. Defendant's obligation to provide an Occupancy List was expressly set forth in the contract. Defendant failed to fulfil its agreement and, therefore, is responsible for the costs plaintiff incurred maintaining the list.

## V. *Acceptance of Building No. 19*

The Agreement to Lease provided for "Phased Occupancy." This allowed defendant to accept housing units as they were finished, but before completion and final acceptance of the entire complex. In order to qualify for Phased Occupancy the completed portion of the housing units had to:

a. Be complete and ready for habitation.

b. Be in compliance with applicable health, safety, housing, building, and other codes, laws and ordinances.

c. Be in substantial compliance with the requirements of this Agreement to Lease.

d. Be sufficiently completed to permit peaceful and full occupancy of that portion of the Improvements.

e. Interim acceptance of such units shall be limited to a minimum of fifty units per interim lease provided, however, that said units are contiguous and comprise complete buildings.

Further, the Government must find that the Developer can provide a satisfactory level of maintenance and operational services for the completed portion.

One of the units that plaintiff offered for acceptance under Phased Occupancy was building # 19. That building required construction of a specially equipped handicapped unit. Plaintiff argues that defendant breached the contract when it claimed that unit # 50 was not handicapped accessible, and refused to accept building # 19. Plaintiff explains that because there was a ramp from the front door to the parking apron which led to the garage, unit # 50 *was* handicapped accessible. Even if defendant preferred an alternative mode, the ramp provided adequate access on a temporary basis. There-

fore, plaintiff maintains that building #19 was substantially complete, and defendant erroneously refused to accept it under the Phased Occupancy plan.

Defendant argues that the building had to be both substantially complete and had to comply with all applicable laws, codes and ordinances. Defendant states that unit #50 did not meet regulations for handicapped accessibility because there was no wheelchair access from the garage to the house. Although a temporary outside ramp was offered as a solution, defendant argues that the ramp did not bring the unit into full compliance with the law.[10] Defendant maintains that a handicapped accessible unit had to provide an accessible route from the house to the garage. An "accessible route" is a continuous unobstructed path connecting accessible elements and spaces in a building. 36 C.F.R. § 1190.3 (1992). Furthermore, a ramp must be provided if there is an abrupt level change. 36 C.F.R. § 1190.31(c). Defendant argues that although a ramp was provided, access from the home to the garage was not direct and unobstructed. Defendant contends that due to the weather in Fairbanks, water, snow and ice could accumulate on an uncovered ramp. Defendant cites to 49 FR 31528, Uniform Federal Accessibility Standards (UFAS) 4.88, Outdoor Conditions, which requires ramps to be designed so that water will not accumulate on the walking surface. In order to avoid accumulation, defendant argues that plaintiff should have constructed a covered ramp.[11]

Plaintiff warrants that the ramp was furnished on a temporary basis and fully complied with all applicable laws. Plaintiff states that the ramp is sloped and will not accumulate water, and that the "custom" in Fairbanks is to provide outside ramps. Moreover, plaintiff insists that the building was offered for acceptance in *April*, and that snow was unlikely to accumulate at this time. Finally, plaintiff asserts that it ultimately did provide an elevator lift inside the garage, even though it did not believe this was necessary under the contract. Plaintiff maintains that it is not interested in reimbursement for this addition, but only for lost rent from the time defendant wrongly refused to accept the building to when defendant finally accepted on August 21, 1987.

Because the contract only allowed interim acceptance of housing units that complied with applicable health, safety, housing and building codes, and laws and ordinances, the court must determine if unit #50 was legally adequate. From the testimony and the arguments provided in the briefs, the court finds that the path from the house to the garage was free from objects. Furthermore, the ramp was constructed so water would not accumulate. Therefore, even if the ramp was not defendant's *preference*, it did *comply* with applicable laws.

The court must construe the contract by its plain and unambiguous language. *National Rural Utilities Cooperative Finance Corp. v. United States*, 14 Cl.Ct. at 136; *Ceccanti, Inc. v. United States*, 6 Cl.Ct. at 528. The contract only requires substantial completion under Phased Occupancy; however, it does not define *what* constitutes substantial completion. Even though building #19 was offered completely constructed, defendant refused to accept it under Phased Occupancy. Defendant's sole objection was over the handicapped accessible unit which provided a temporary outside ramp leading from the house to the garage, instead of providing an elevator lift inside the garage.

**10.** Initially, there was a question as to when the temporary ramp was actually constructed. Defendant stated that an outside ramp was constructed and offered on *April 14*, 1987, as a short term solution, only after the government initially rejected unit #50. During oral argument, however, plaintiff avers that the ramp was constructed by April 4, 1987, and defendant did not provide any contradictory evidence to prove otherwise. Therefore, the court finds that the temporary ramp was provided on April 4, 1987.

Furthermore, defendant's briefs consistently mention that access to the house could only be obtained *over a step*. During oral argument, however, defendant could not provide any testimony as to where this step was and its relevance to this issue. Finally, both parties clarified that their argument was over whether the temporary ramp was sufficiently accessible for a handicapped individual and in compliance with applicable laws.

**11.** UFAS 4.88, does not *require* ramps to be covered.

Contrary to defendant's statement, that plaintiff was offering a unit that could not be used by the person it was intended for, an outside ramp would have been adequate on a temporary basis.[12] Under the Phased Occupancy plan, defendant could certainly have accepted building # 19, with a handicapped unit that included a temporary ramp and required that an elevator lift be installed before final completion. In the unlikely event of a snow storm in the spring, plaintiff is responsible for snow removal and would have been required to remove snow if any accumulated.

Plaintiff's statement, that other buildings with handicapped facilities in Fairbanks also provide outside ramps, is persuasive evidence. Although this is not relevant as to what the parties agreed would ultimately be provided under the contract, it justifies the finding that unit # 50 qualified as handicapped accessible. Therefore, building # 19 could have been accepted under Phased Occupancy and defendant is directed to reimburse plaintiff for lost rent.

### VI. *Prompt Payment*

Under the Lease, monthly rent payments must be paid "in arrears." Plaintiff maintains that defendant has continually proffered late monthly rental payments, and requests interest under the Prompt Payment Act, 31 U.S.C. § 3903 (1988). According to plaintiff's interpretation monthly payments "in arrears," are rental payments made on the last day of every month of beneficial occupancy. According to plaintiff, there are numerous instances where defendant has paid anywhere from 2 to 15 days late.

Defendant counters that the contract does not provide a specific date when rental payment is due. Payable monthly "in arrears" defendant argues, does not mean on the last day of the month, but a statement of policy that the government should only pay *after* it has received services.[13] Defendant states if a specific payment date is not established, the Prompt Payment Act provides that pay-

ment is due 30 days after a proper invoice for the amount due is received. Defendant contends that it has always paid within 30 days after receiving an invoice from plaintiff.

The language of an agreement, or in this case a lease, must be given the meaning which would be derived by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp.* 169 Ct.Cl. at 388, 351 F.2d 972. After reviewing the Lease, the court concludes that the only reference to rent payments is that they would be made "in arrears." The Lease does not discuss either a specific date when rent payment must be made by, or an obligation to submit invoices before payment is tendered.

The *Random House College Dictionary* 75 (1st ed. 1980), defines "in arrears" as something that is behind in being paid. While this definition supports defendant's contention, that payment monthly "in arrears" is payment for the previous month of tenancy, the dictionary can only provide an out of context, general definition. In interpreting contract terms, the context and intention of the parties are more meaningful than the dictionary definition. *Fry Communications, Inc. v. United States*, 22 Cl.Ct. 497, 503 (1991).

There is no evidence, however, that the Lease contemplates "in arrears" to mean on the last day of the month. Furthermore, after considering the parties documents, the court finds itself in agreement with the analysis previously published by the Board of Contract Appeals. In *Appeal of Union Center Plaza Associates,* GSBCA No. 4851, 79–1 BCA ¶ 13,555 (1978), the government entered into a lease and agreed to make payments "on a calendar month basis 'in arrears' beginning at the end of the first calendar month of the lease term." The contractor, as in this case, contended that payment of rent was due on the last day of the month, or in no event later than the first day of the following month. Further, the

---

12. Tr. p. 35.

13. Defendant distinguishes the government's rental payment from that of a commercial lease

which generally requires rental payments on the first day of the month prior to beneficial occupancy.

only reference for time of payment specified in the lease was "in arrears." The board found that in general if no date is designated for payment, rent is due on the last day of the time period to which it is reserved. Reasoning that only one meaning could reasonably attach to the contract, the board held that rent was payable sometime after the last day of the month within a reasonable time period.[14] Other cases have also attached this meaning to "in arrears" when dealing with monthly rental payments. In *Appeal of Robert DiDomenico*, GSBCA No. 5539, 82–2 BCA ¶ 16,093 (1982), the board found that although the contract provided for payment "in arrears" beginning at the end of the first calendar month of the lease term, the contract did not specify by which date the rent for the previous month's occupancy should be made. The court found that where a contract does not specify the date of performance of one of its terms, performance must be rendered in a reasonable time. *See also, Appeal of Lea Company*, GSBCA No. 5697, 81–2 BCA ¶ 15,208 (1981) (finding that rent paid in monthly increments and "in arrears," is the rent for a given month's occupancy which is due and payable in the following month); *Ginsberg v. Austin*, 968 F.2d 1198, 1199 (Fed.Cir.1992) (concluding that lease required monthly payment "in arrears," and payment made anywhere from 8 to 30 days after the month of occupancy was satisfactory); *cf., Corman v. United States*, 26 Cl.Ct. 1011, 1015 (1992) (describing "in arrears" as the rate of payment, not the time period in which rental payments are due). While these cases do not deal with the Prompt Payment Act, all the cases do establish that payment "in arrears" is *not* a requirement for rent to be paid on the last day of the month.

The court finds that without a specific date provided in the Lease, "in arrears" contemplates payments made in a reasonable time period following month of occupancy. Because the parties stipulate that this Lease follows the Prompt Payment Act, defendant's interpretation that rent is due within 30 days after submission of an invoice is correct. Because the record reveals that defendant did make rental payments within 30 days of receiving an invoice, no interest to plaintiff is due.

VII. *First Year of the Lease*

Plaintiff and defendant disagree on what date the first year of the lease commenced. Plaintiff maintains that the first year began when the Interim Lease was signed on January 24, 1987. Defendant, on the other hand, avers that the first year of the lease did not begin until the Permanent Lease was signed on November 6, 1987. The court must determine the significance of both the Interim Lease and the Permanent Lease, and consider whether they are two separate contracts or, are all part of one agreement. The resolution of this issue bears on two of plaintiff's claims.

At the outset, the court recognizes that there are three different documents which apply to this issue: the Agreement to Lease, which governed the parties' relationship during construction at Fort Wainwright; the Interim Lease, which directed the parties relationship from the time the project neared completion to final delivery; and the Permanent Lease which supplies the parties contractual obligations while defendant occupies Fort Wainwright.

Determining when the first year of the lease began is necessary to calculate adjustments of total real estate taxes for years subsequent to the second lease year and to calculate annual maintenance rental increases. Under Article IV, the Permanent Lease provides "that portion of the annual rental attributable to maintenance shall be increased or decreased at the commencement of each year of the lease after the first year of the lease." Under Article VI, the Permanent Lease provides "if the total general real estate taxes levied during a lease year exceed the total general real estate taxes levied during the second lease year, the increase for that year shall be increased by 80% of the

14. The board determined that a reasonable time period for payment was anywhere from 5 to 15 days into the next month. The parties in the instant case, however, have stipulated that the Lease follows the Prompt Payment Act, 31 U.S.C. § 3903 (1988). Therefore, the time period for payment as defined in the Act is more applicable.

excess and reimbursed by the Government."[15] Plaintiff insists that the calculations for adjustments must begin on January 24, 1987, because the Interim Lease and the Permanent Lease are one comprehensive agreement. Thus, plaintiff maintains, the first year of the lease began when the Interim Lease was executed.

Plaintiff also claims that defendant should have commenced payment of the full 100 percent rental value when all the units were completed on January 24, 1987, rather than continuing to pay the 90 percent rental (under Phased Occupancy) until October 6, 1987. Plaintiff avers that the administrative actions which took place between these dates, such as the actual signing of the Permanent Lease, are not indicative of when the first year began.

All of the documents include sections which address the execution of the Permanent Lease. The Agreement to Lease, entered into on June 27, 1986, under "determination of acceptance" provides:

Upon completion of the entire Improvements, the Developer shall provide written notification to the Government's designated representative ... the Government's designated representative shall issue a Certificate of Acceptance....

In addition, both the Agreement to Lease and the Interim Lease include the following provisions:

*Lease of Improvements and Premises.* Upon completion, final inspection, and issuance of any Certificate of Acceptance for the improvement as provided in this Agreement, Government and Developer shall execute the Lease....

\* \* \* \* \* \*

*Phased Occupancy.* In the event of completion of the units ... and interim acceptance of such units by the Government, the Developer, and the Government shall enter into an interim lease.... [R]ental for such units shall be 90% of per unit rental ... and the term of occupancy, *shall expire upon full execution of the Lease,* as

set forth in Exhibit "D".[16] [Emphasis added.]

Defendant maintains the Agreement to Lease, the Interim Lease and the Permanent Lease are all separate documents which cover well defined stages of the parties arrangement. Defendant argues that the controlling document for the current time period (leasing the completed units for 20 years) is the Permanent Lease, which was officially executed on November 6, 1987. Defendant insists that this date determines when the first year of the lease began.

The general rules for interpretation of leases were accurately stated in *Romala Corp. v. United States,* 20 Cl.Ct. 8, 11 (1990) (*citing Randallstown Plaza Associates v. United States,* 13 Cl.Ct. 703, 706 (1987)). "The court's first responsibility is to attempt to interpret the lease in an effort to determine what the parties agreed to in their bargain." *Id.* at 11. If the lease is unambiguous, then the court must analyze its language in accordance with the plain and ordinary meaning. *Bloomington Hosp. v. United States,* 29 Fed.Cl. 286, 295 (1993). Further, if the parties claim that the lease language is ambiguous, the court may resolve the question if it finds that only one reasonable interpretation of the lease is possible. *Romala Corp.,* 20 Cl.Ct. at 11.

The Agreement to Lease conclusively sets forth that a number of administrative tasks must be achieved before full execution of "the Lease" (Permanent Lease) is accomplished. Moreover, the contract specifically states that the 90 percent rental shall expire upon *full execution of the lease.* The court concludes that no other reasonable meaning could attach to these words. The term "full execution" undoubtedly includes the issuance of the Certificate of Acceptance, the signing of the Lease, etc., which were not completed until November 6, 1987. Therefore, plaintiff was entitled to 90 percent of the rental value until November 6, 1987, when the Permanent Lease was actually executed, not when the housing units were complete.

---

**15.** The Interim Lease also included these sections.

**16.** Exhibit "D" is an unexecuted copy of the Permanent Lease.

█ The Interim Lease includes a clause specifically stating its purpose:

"The Interim Lease is intended to govern the relationship between Developer as Lessor and Government as Lessee with respect to property and housing units completed, delivered to and accepted by Government *prior to final completion and delivery of the entire Premises and all the housing units to the Government.* When all housing units and the entire premises are delivered to the government, and *the Lease* attached[17] ... has been executed, *this Interim Lease shall terminate.*" [Emphasis added.]

This clause is very straightforward. Defendant created a system whereby it could accept some housing units before construction of the facility was complete. Presumably, this arrangement was mutually beneficial to both parties. Because some of the units could be utilized before the Permanent Lease was executed, the Interim Lease made it possible for plaintiff to begin collecting rent and defendant to provide housing for the occupants before full completion.

The Interim Lease, however, had a clear termination date. It terminated when the actual lease was executed. Plaintiff argues that the Interim Lease did not end, instead the Permanent Lease just extended the terms. The court determines, however, that if the Interim Lease was the beginning of the actual lease, it would have been incorporated into the Permanent Lease. Instead, the Interim Lease was terminated and replaced with another new agreement, the Permanent Lease.

Moreover, plaintiff's interpretation is inconsistent with the specific terms of the Interim Lease. Throughout that agreement there are express references to "this Interim Lease." For example, Article III, Assignment and Subletting, provides: *"This Interim Lease,* or any part thereof, shall not be conveyed...." [Emphasis added]; Article IV, Rent, provides: "the Government shall pay the Developer an annual Rental, as set forth in Exhibit "D" of *this Interim Lease"* [Emphasis added]; and Article V, Right of First Refusal, provides: "At any time during the term of *this Interim Lease* and upon expiration or earlier termination...." [Emphasis added.]

█ In the same manner, however, Article IV, Rent (which includes the clause referring to annual rental attributable to maintenance), sets forth: "That portion of the annual rental attributable to maintenance shall be increased or decreased at the commencement of each year of *the lease* after the first year of *the lease* and ending with the twentieth year of *the lease....*" Because the contracts explicitly refer to "this Interim Lease" in some instances, the general notation to "the lease," suggests that each is a separate document.

By making specific reference to *this Interim Lease,* the parties distinguished the Permanent Lease. Article IV, clearly illustrates that the terms are used to consciously differentiate between the individual contracts. The Interim Lease was a temporary arrangement, controlling the parties during an *interim* period until the Permanent Lease was signed.

Title 10 U.S.C. § 2828 (1988), *as amended by* Pub.L. No. 98–115 § 801, governs the parties agreement and restricts the entire lease from exceeding 20 years, excluding the time period required for construction of the housing facilities. The Interim Lease states that the contractor "is constructing" 400 housing units. Therefore, when the Interim Lease was entered into, the time period for construction of the housing facilities was not over. Thus, under the statute, the Interim Lease period would not be included in computing the 20 years for the lease.

Furthermore, it appears the government would not get what it contracted for if the lease period began on the date the Interim Lease was signed. Because the lease itself cannot exceed 20 years, by applicable statute, defendant anticipated renting a complete facility for 20 years (19 years and 6 months, with 6 months for the contractor to remove improvements). If the date of the Interim Lease is included, either the contract period will exceed 20 years and violate the statute

---

17. Attached to the Interim Lease was an unexecuted copy of the Permanent Lease.

or the government will not be able to lease a complete facility for 20 years. (i.e., the time period will have to be shortened to include the Interim Lease period).

Thus, the court concludes that the Interim Lease and the Permanent Lease are two separate agreements. Moreover, the Interim Lease had a distinct date of termination, while the Permanent Lease had a equally distinct date of inception. On November 6, 1987, both parties signed the Permanent Lease which governs the following 20 years of their relationship. For purposes of calculating the maintenance increases and adjustment of real estate taxes, the first year of the lease began on that date. Further, defendant was within its rights when it continued paying the 90 percent rental value of the property until the Permanent Lease had been executed. No further adjustments are due.

## VIII. *Fire Damage*

On June 6, 1992, a unit at Fort Wainwright was damaged by fire due to occupant negligence. The Fire Department prepared a "Fire Incident Report" and concluded that the fire started when the occupant's daughter used a match to light a candle and then threw the match into the trash located in the pantry/kitchen area. Plaintiff repaired the damages and sought reimbursement from defendant. Defendant, claiming that it was not obligated under the contract, refused to pay.

Plaintiff asserts that under the contract, defendant is responsible for the cost of repair for fire damages caused by an occupant's negligence. Plaintiff first cites to the clause titled "Damages Caused by Occupants," to support its claim. This clause provides that "damages to a housing unit ... which are beyond normal wear and tear and are caused by the government or an occupant, its dependents, or invited guests" must be paid by the government. Plaintiff avers that fire is beyond normal wear and tear.

Second, plaintiff points to Article X of the Lease, "Damage or Destruction by Fire or Other Causes" which states:

If any of the housing units or improvements are destroyed by fire or other casualty, *except in case of negligence on the part of the occupant,* the Government may, at its sole option, terminate the Lease immediately in respect to the destroyed housing unit or units, and if so terminated, no rent shall accrue to the Developer after the date of such destruction. [Emphasis added.]

This clause obligates defendant to continue paying rent to plaintiff if an occupant causes a fire in a housing unit. Therefore, plaintiff maintains that fire caused by occupant negligence is treated differently under the contract than other causes of fire.

Defendant states that "fire" cannot be interpreted as "damage beyond normal wear and tear" under the contract. Defendant argues that the contract specifically discusses and clearly states that plaintiff is responsible to correct *and pay* for all damages resulting from fire. Furthermore, defendant avers that "occupant caused fire damage" is only significant because it limits the government's right to terminate or suspend the Lease and stop making rental payments.

Questions of contract interpretation are issues of law and may be disposed of on summary judgment. *P.J. Maffei Bldg. & Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984). Contract provisions should be interpreted in harmony to avoid any conflicts which would render any part of the contract meaningless. *B.D. Click Co.,* 222 Ct.Cl. at 299, 614 F.2d 748. Further, the words of a contract, which are in question, must be given their plain and ordinary meaning. *George Hyman Constr. Co. v. United States,* 832 F.2d 574, 579 (Fed.Cir.1987). In this case, the particular word in issue is "fire." Under the contract, Article IX, specifically states that plaintiff bears responsibility for "loss or damage by fire, lightning, storm, tempest, explosion, impact, aircraft, riot, civil commotion, bursting or overflow of water tanks, apparatus or pipes, flood, labor disturbances, earthquake, malicious damage (other than government caused) or any other causality or act of God." A cursory reading of this paragraph suggests that defendant's interpretation of "fire" is reasonable.

It is significant, however, that the entire list consists of "act of God" type causalities.

Apart from fire, this list only includes unusual accidents that do not result from an individual's negligence. For instance, it is unlikely or impossible for an occupant to negligently cause "lightning, storm, tempest, explosion, impact aircraft, riot, civil commotion bursting or overflowing of water tanks, apparatus or pipes, flood, labor disturbances, earthquake, malicious damage (other than government caused)." [18] The list is left open to include any other *causality or act of God.* Items on the list will, therefore, be interpreted by the words which they are associated. "The true meaning of the terms cannot be determined out of context and without regard to their purpose." *Sea–Land Service, Inc. v. United States,* 204 Ct.Cl. 57, 493 F.2d 1357, 1366, *cert. denied,* 419 U.S. 840, 95 S.Ct. 69, 42 L.Ed.2d 67 (1974) In this instance, fire could imply *only* accidental fire, or fire that is not caused by an individual or an occupant but by some malfunction.

Both plaintiff's and defendant's heavy reliance on Article IX of the contract, to support their contentions leads to tenuous and unconvincing arguments. By interpreting "fire" in the framework of this one section, the parties offer stained and out of context analysis of the term. *ITT Arctic Services, Inc. v. United States,* 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975). Stated in full, Article IX, "Loss, Damage and Insurance," provides:

> The Developer shall, in any event and without prejudice to any other rights of the Government bear responsibility for loss or damage by fire, lightning, storm, tempest, explosion, impact, aircraft, riot, civil commotion, bursting or overflow of water tanks, apparatus or pipes, flood, labor disturbances, earthquake, malicious damage (other than government caused) or any other causality or act of God, and shall maintain at the expense of the Developer and at all times during the term of this Lease, insurance coverage against the risks enumerated above with a reputable insurance company and shall ensure that the Government is named as coinsured on any such policy. In no circumstances will the Developer be entitled to assign to any

third party rights of action which the Developer may have against the Government. Developer's liability shall be limited to leased property.

Plaintiff argues that while it bears "responsibility for loss or damage by fire" under Article IX, the same clause also reserves plaintiff's right of action against the government to recover for fire damages. Thus, plaintiff argues, by providing that a claim involving fire damage *could* exist, defendant concedes that in some instances the cost of fire damages are refundable to plaintiff.

On the other hand, under Article IX, plaintiff is required to carry insurance to cover costs for fire damages, and defendant argues that this indicates that plaintiff must pay for damages caused by fire and must seek reimbursement from the insurance company, not defendant. Otherwise, defendant maintains, plaintiff would receive a double recovery (*i.e.,* payment from insurance and payment from defendant).

Contract provisions cannot be read in isolation. Instead, each and every provision must be considered together, if possible, in order to interpret the contract as a whole. *Muniz v. United States,* 972 F.2d 1304, 1310 (Fed.Cir.1992); *Omni Moving & Storage of Virginia v. United States,* 27 Fed. Cl. 677, 687 (1993). Plaintiff's inability to assign rights of action against the government is simply an assurance to defendant that rights of action will not be assigned to a third party creditor or a surety. By incorporating the clause: "In no circumstances will the Developer be entitled to assign to any third party the rights of action which the Developer may have against the Government," defendant does not concede that plaintiff has any specific right of action for fire damages or that any fire claim will be meritorious.

Equally contrived is defendant's analysis concerning insurance. Plaintiff's obligation under the contract to carry insurance does not correspond to responsibility to pay

---

**18.** "Malicious damage (other than government caused)" is the only circumstance where an individual can cause the damage. It is, however, "other than government caused," and an occupant could not fit into this category.

for fire damage caused by occupant's negligence. During oral argument, plaintiff stated that the insurance covers only what plaintiff interpreted it was liable for under the contract, i.e., fire that did not result from occupant negligence.[19] Furthermore, plaintiff is not the only party insured under the contract, defendant is also co-insured. Thus, the fact that plaintiff carries insurance under the contract is not significant in determining who must pay for fire damages.

■ The most compelling evidence on this issue, however, has not been fully researched or briefed by either party. Plaintiff states that defendant accepted and paid a fire loss claim in 1989 which also resulted from occupant negligence. Defendant apparently paid $44,725.74, for the cost to repair a burned unit when the investigation by the Fort Wainwright Fire Department indicated the cause of fire was occupant negligence. Plaintiff states that defendant is disingenuous in taking the opposite position on this claim now. Defendant's sincerity, however, is not as decisive as its previous conduct under the contract. When parties agree to an interpretation before it becomes a controversy, "such interpretation shall be given great if not controlling weight." *Baltimore Contractors, Inc. v. United States,* 12 Cl.Ct. 328, 341 (1987). Defendant could not dismiss the fact that under the contract plaintiff has previously recovered for fire damage repair when an occupant was negligent. *Alvin Ltd. v. United States Postal Service,* 816 F.2d 1562, 1566 (Fed.Cir.1987) ("One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises").

In *Macke Co. v. United States,* 199 Ct.Cl. 552, 467 F.2d 1323 (1972), the court found that the best evidence of contract interpretation is how the parties act under the arrangement, before the dispute. The court found this evidence far more "revealing than the dry language of the written agreement by itself." *Id.* 467 F.2d at 1325. In its briefs, plaintiff provides a letter sent to defendant, for the previous fire, requesting payment for repairs. The letter indicates that defendant

originally took the same position, as it does now, that under the contract plaintiff is accountable for costs resulting from fire damage. In that letter plaintiff states, as it does here, that defendant is liable for the costs of repair when fire damage is caused by occupant negligence. Subsequently, plaintiff maintains that defendant paid the full amount requested.

■ The difficulty the court encountered in deciding this claim is that neither party has supplied sufficient evidence regarding the parties prior dealings under the *same* contract. In its briefs, plaintiff only offers its initial letter to defendant and does not supply any return communication or receipts. During oral argument, defendant could not augment the record with any details concerning the previous claim, and even plaintiff had problems remembering evidence it originally cited to in its briefs.[20] Although the court must accept plaintiff's pleading as true, an accounting of a past practice under the contract must be supplemented by more than just plaintiff's word. On the evidence of record, it remains unclear whether "fire" should be interpreted to include "caused by occupant negligence."

Thus, the court finds that issues of fact remain as to whether defendant breached the contract by failing to reimburse plaintiff for repair costs of fire damages caused by a negligent occupant at Fort Wainwright. Because these factual issues are material to the outcome of the instant case, summary judgment is precluded. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509.

## IX. *120–Day Delivery Requirement*

Defendant refused to accept 14 units offered on September 28, 1987, under the Phased Occupancy program because plaintiff provided insufficient notification of their delivery. Plaintiff states that defendant acted unreasonably because the contract documents did not require provision of notice to defendant of impending delivery of the units.

---

**19.** Oral Argument Tr. p. 130.

**20.** Oral Argument Tr. pp. 124–25.

Plaintiff, however, concedes that both parties mutually agreed that notice of proposed deliveries would be provided on a regular basis of 30, 60, 90, and 120–day intervals. Furthermore, plaintiff maintains that the reason for the incremental notification was to allow plaintiff opportunity to change the schedule of delivery. Plaintiff adds that defendant accepted this notification procedure.

Under Phased Occupancy, plaintiff could complete a portion of the units and seek interim acceptance of such units from defendant before final delivery. The time period required for full completion of all the improvements at Fort Wainwright was provided in the Agreement to Lease. Exhibit "C," Completion Date Schedule, sets forth:

> The improvements shall be completed on or before 540 days after execution of this Agreement to Lease.[21] (*Phased delivery of the improvements to be negotiated with the Developer.*) [Emphasis added.]

Plaintiff provided a schedule of delivery dates to defendant on or about December 18, 1986, stating its intention to deliver 64 units on September 26, 1987. On March 18, 1987, plaintiff maintains that defendant sent notification that it would not accept units on Thursdays, Fridays, and Saturdays. Plaintiff avers that it did not agree with this requirement, but accommodated defendant by changing the September 26, 1987, delivery date to September 28, 1987.

Plaintiff further maintains that on May 15 and July 30, 1987, it sent notice of intent to deliver 70 units on September 28, 1987. Finally, on August 29, 1987, plaintiff contends that it sent notice of intent to deliver 84 (instead of 70) units on September 28, 1987. On September 20, 1987, defendant informed plaintiff that it would not accept the additional 14 units, because it needed 120–days' notice before delivery. The units were not accepted on September 28, 1987, and were only accepted with final delivery on October 8, 1987.

Plaintiff insists that the requirement for 120–day notice of delivery was a unilateral new condition that defendant asserted only *after* the RFP had been awarded. Plaintiff contends that the Lease documents do not include any requirement of 120–days' notice (or any notice requirement) for proposed delivery of completed units under Phased Occupancy. Plaintiff maintains that defendant thus breached the agreement by not accepting those 14 units and requests in damages the unpaid rent.

Defendant, on the other hand, argues that the Lease documents do require notice of impending delivery of units under Phased Occupancy. Specifically, defendant maintains that under exhibit "C," any delivery of units prior to 540 days *was to be negotiated by the parties.* Thus, defendant maintains, it did not have any obligation to accept units without successful negotiations.

Defendant states that plaintiff provided a site plan on July 22, 1986, which designated Phased Occupancy dates for eight areas but reserved that this schedule could change. Defendant states that in ensuing discussion between the parties, defendant stressed to plaintiff its need for 120–day notice of intent to deliver, and notified plaintiff of this in writing on September 25, 1986.

Defendant states that plaintiff initially objected to the 120 day notice requirement, but, nevertheless, submitted a schedule on October 17, 1986, which provided at least 120–days' notice of planned delivery dates. Defendant cites to a letter written by plaintiff on that date which stated:

> Consistent with our verbal agreement, we reserve the right to revise the area delivery dates and unit composition up to 120 days prior to the scheduled delivery dates.

Defendant relies on this letter to support its contention that the parties agreed to the 120–day notice of delivery. Defendant, however, fails to mention the following sentence in the same letter:

> We also agree to keep the Corps and DEH informed to any potential changes in the delivery schedule at 90, 60, and 30 day increments in advance of each planned turnover date.

This additional sentence clouds the facts and certainly raises questions of whether the

---

21. The Agreement to Lease was signed on June 17, 1986.

282

parties actually agreed to a stringent 120–day notice of delivery *with no changes,* or whether they agreed to provide notice of delivery by 120 days, with a right to continue to change the proposed quantity up to 30 days before the turnover date.

Defendant does admit that at different times during the interim period, it did accept units with less than 120–day notice. Defendant insists that this was for plaintiff's *convenience* and only if personnel were available to occupy the units. Defendant, however, disputes that it waived the agreement to 120–day notice by this conduct.

■ Before interpreting the words of a contract, the court must first determine whether there *was* an agreement, or a meeting of the minds, and if so, whether it was manifested in an objective and definite manner so that the terms and conditions are easily discerned. For "[a] court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intention in a manner that is capable of understanding." 1 Corbin, *Contracts* (1951) § 107. With regard to these questions, which are essentially factual, the Lease provides little information. Specifically, the contract expressly sets forth a plan for phased delivery of units as they were completed. As far as a delivery schedule, the Agreement to Lease only includes boilerplate language in Exhibit "C," which sets forth when the entire project will be completed, and, only in parenthesis, adds one sentence about negotiating phased delivery. This provision merely recognizes that phased delivery could only be practically determined after the award of the contract. The contract does not refer to a delivery schedule in any other section; moreover, the Phased Occupancy section does not include a requirement of 120–days' notice before unit delivery.

Contract interpretation ordinarily begins with "the plain meaning of the provision in question." *S.W. Aircraft Inc. v. United States,* 213 Ct.Cl. 206, 212, 551 F.2d 1208, 1212 (1977). Although the Agreement to Lease provided for phased delivery of the completed units, the schedule of delivery was a subordinate provision of the contract. *Be-*

*ryllium Corp. v. United States,* 196 Ct.Cl. 12, 449 F.2d 362 (1971) (determining that delivery schedule was subsidiary portion for contract made for the convenience of both parties). Apparently, neither party considered the delivery schedule to be of such importance as to memorialize it in a written agreement.

■ Therefore, the court must determine if the contract permitted oral authorization, which is a matter of legal interpretation within the purview of this court. *See, P.J. Maffei Bldg. & Wrecking Corp.,* 732 F.2d at 913. The Lease unquestionably allowed oral modifications regarding unit delivery, *i.e.,* negotiations; and since no express written agreement about delivery notice existed, the parties' conduct during the performance of the contract must be given great weight. *Beryllium Corp.,* 196 Cl.Ct. at 21, 449 F.2d 362. The practical interpretation of a contract by the parties, before the dispute arises, is an incomparable indicator of the parties' true intentions. *See, Blanchard v. United States,* 171 Ct.Cl. 559, 347 F.2d 268 (1965); *Manufacturers Aircraft Ass'n v. United States,* 77 Ct.Cl. 481, 1933 WL 1818 (1933), *cert. denied,* 291 U.S. 667, 54 S.Ct. 442, 78 L.Ed. 1057 (1934).

■ The problem in the instant case, however, is the inconsistency of the parties actions. The auxiliary communications between the parties which were provided for the record, establish that there was some discussion of a requirement for 120–day notice before unit delivery. It is not clear, however, whether the parties understood what that notice meant. Both plaintiff and defendant readily admit that the 120–day notice was never followed, or enforced, until the particular delivery in question came into dispute. Defendant contends that it did not enforce this requirement before, in order to accommodate plaintiff. On the other hand, plaintiff insists that it never agreed to a 120–day notice of delivery, and contends that in fact, any target dates for delivery were solely for its benefit.

It is evident that the parties squarely conflict on the basic facts. Further, the contract provides no specific section dealing with de-

livery schedule, which the court can interpret as a matter of law. Even if the court were to glean an intent from the parties' performance during the contract, their conduct was far too inconsistent to provide a basis for a decision. Because these factual issues are material to the outcome of the instant case, summary judgment is precluded. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509.

## X. *Installation of the Electrical Distribution System*

Plaintiff contracted with a local utility company to install individual electricity meters in each unit at Fort Wainwright. As a result, defendant asserts that plaintiff has not conformed with contract specifications requiring installation of an electrical metering system that provides the least cost to the government. Defendant maintains that a single point master meter, rather than individual electrical units, would afford a greater savings to defendant.

Under the contract plaintiff is required to provide an electrical distribution system for service of the housing units. Plaintiff holds title to any constructed improvements, while defendant is required to pay all rates and charges for electrical current. Electrical distribution is provided by a utility supplier.

Specifically, the RFP issued to plaintiff set forth:

> *Metering.* Master or individual metering is acceptable so long as the Government is billed totalized amounts monthly which facilitate the lowest rate possible to the project. If the project is master metered, electricity shall be routed via common point for each building to facilitate the possibility for future individual unit metering. If master metering is preferred, Developer shall insure the plan meets with City of Fairbanks' requirements.

The contract also required plaintiff to obtain all necessary permits and licenses for the project, as well as comply at its sole cost and expense with laws, codes and ordinances at all levels (federal, state, and local).

22. Plaintiff's Appendix (App.) III, p. 576.

Pertinent to this issue is the Public Utility Regulatory Policies Act of 1978, Pub. Law 95–617, Nov. 9, 1978, 92 Stat. 3120, 16 U.S.C. § 2611, 2623, 2625 (PURPRA). The purpose of PURPRA is to encourage conservation of electricity, optimize efficiency and yield equitable rates to consumers. The State of Alaska adopted this standard in the Alaska Administrative Code 3 AAC 50.200, effective October 15, 1982, which requires *individual metering* be provided to commercial housing units. 3 AAC 50.200(b), however, states: "for good cause shown the commission will, in its discretion, waive the application to a utility of all or part of 3 AAC 50.200."

Almost immediately after the award to plaintiff in January 1986, the Alaska Public Utilities Commission (APUC) commenced a proceeding to resolve a service area dispute between Golden Valley Electrical Association (GVEA) and Fairbanks Municipal Utility Systems (FMUS). Apparently the government agent present at the hearings requested the commission to consider a waiver of 3 AAC 50.200, so that plaintiff could install a single point master meter rather than individual meters at Fort Wainwright.

During the proceeding the General Manager of GVEA, Michael P. Kelly, testified that GVEA's proposal contemplated servicing the project with individual electric meters, and that GVEA would absorb the capital costs of a primary distribution system of approximately $400,000.[22] Mr. Kelly further testified that if the Army bore the cost of the distribution system, and preferred service through the single point master meter, then GVEA *could* provide that type of service at a lower cost. The general manager believed that the project was governed by PURPRA, which would prohibit master metering. He proposed, however, that if the commission would waive its application in this circumstance, GVEA would provide that type of service.

Plaintiff's testimony before the commission made· it clear that it would not install a master meter even if the commission granted a waiver. Specifically, plaintiff submitted a

statement to the commission stating that no party had officially requested in any application a waiver of the rules regarding individual meters. Plaintiff averred that no decision be made on that issue. In the alternative, if the commission did determine this issue, plaintiff requested that the waiver be limited so that the manner of metering could be determined by the utility and the customer.

On June 12, 1986, the hearing officer concluded that:

1. GVEA should be granted exclusive right to serve the housing project.

2. GVEA is governed by the commission's regulation 3 AAC 50.200, which requires the service to such housing units be provided through individual meters.

3. DOD, not the consumers will be paying the electric bills. Therefore, the purpose of 3 AAC 50.200, to promote conservation of energy by ensuring that the individual consumers are responsible for their own consumption, will be thwarted.

4. The application of 3 AAC 50.200 to the housing complex should be waived, even though NSHAC indicated that regardless of the commission officer's findings, NSHAC intends to install individual meters.

Immediately *after* the conclusion of the APUC hearings, plaintiff entered into an agreement with GVEA to install individual meters. Plaintiff stated that the waiver was "unsolicited," and would interfere with previous and ongoing contractual negotiations with GVEA. The result of the final agreement was that GVEA would pay full cost of design, construction, and maintenance of the system, and recover the investment through the individual meters and the rates charged to consumers.

Plaintiff argues that at the time the RFP was issued, single point master metering was not allowed by law. Because the RFP required full compliance with the applicable laws, plaintiff believed its only choice was to equip the facility with individual electric meters. Apparently, plaintiff was not alone, not one of the six proposers for the project contemplated installing a single point system. Evidently, pre-bid proposers lacked standing to apply for a waiver of 3 AAC 50.200. Accordingly, plaintiff prepared its bid intending to service the project with individual meters.

Plaintiff contends that its major concern is what would happen after the lease with the Army expired. Upon expiration, plaintiff will lease to the general public, if defendant declines to renew its contract, and it is not clear if the waiver would extend to those circumstances. Therefore, plaintiff would have to reconstruct a new electrical system designed for individual metering.

Defendant succinctly argues that the contract allowed the developer a choice between electrical systems; however, the system it installed had to facilitate the lowest possible rate for the government. Defendant insists that when a waiver was obtained, plaintiff was free to install the single point system. This was not only preferred by defendant, the ultimate customer, but after the APUC's waiver, was required by the contract.

 It is well established that where the provisions of a contract are phrased in clear and unambiguous language, "the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties...." *Elden v. United States*, 223 Ct.Cl. 239, 252, 617 F.2d 254, 260–61 (1980); *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). At first glance, this task seems simple. The RFP permitted the developer the option to install either a single point master meter *or* individual electric meters, *provided* the system the developer chose extended the lowest possible cost to the government. Although the record sufficiently establishes that the single point master meter would be less expensive for defendant, it does not necessarily follow that plaintiff's performance deviated from the plain meaning of the contract. This analysis would isolate one clause without considering the contract as a whole. *Erwin v. United States*, 19 Cl.Ct. 47, 55 (1989). Another clause in the RFP required plaintiff to prepare its bid so that all elements of the contract would conform with applicable laws and codes (federal, state and local). Therefore, plaintiff was obligated to install an electrical system that also complied with PURPRA and the Alaska

Administrative Code 3 AAC 50.200. This interpretation gives reasonable meaning to all parts of the contract, and is vastly preferable to one that leaves portions of the contract meaningless. *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir. 1985); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983).

Plaintiff argues that the government's interpretation creates a latent rather than a patent ambiguity within the contract; thus it had no duty to clarify before the contract was awarded. *American Bankers Life Assur. Co. v. United States,* 12 Cl.Ct. 166, 173 (1987) (holding that a contractor must seek to clarify perceived ambiguities prior to executing the contract). In order to rise to the level of patent ambiguity, the obscurity must be blatant and vital, "not subtle, hidden, or minor." *S.O.G. of Arkansas v. United States,* 212 Ct.Cl. 125, 130, 546 F.2d 367, 370 (1976). When ruling on the parties' interpretation, the court's analysis is that of "a reasonably intelligent person acquainted with the contemporary circumstances" surrounding the contract. *John C. Grimberg Co. v. United States,* 7 Cl.Ct. 452, 456, *aff'd,* 785 F.2d 325 (Fed.Cir.1985). Moreover, each party's interpretation must be reasonable. *Grimberg,* 7 Cl.Ct. at 456. If the language is susceptible to more than one reasonable interpretation, the ambiguity will be resolved in favor of the party who did not draft the language. *Stuyvesant Dredging Co. v. United States,* 11 Cl.Ct. 853, 861 (1987).

The court, however, can find neither a latent nor a patent ambiguity in the contract. The language at issue is stated in simple and straightforward terms. Plaintiff correctly interpreted the contract by deciding that a single point master meter would not comply with federal and local laws and, therefore, would not be a feasible option under the contract. By its own contractual restraints, defendant did not expect plaintiff to provide a system that violated the law just to afford the government the lowest price. Furthermore, plaintiff could not have been expected to submit a proposal with the expectation that the commission would, at some future date, waive its application of law.

■■■ In this case, the electrical system was installed only *after* the commission made its findings. The matter here has less to do with interpreting contract language and more with whether plaintiff *could* have delivered to defendant what it wanted. The question, therefore, is how clear did the government communicate its objectives? When contract specifications originally afford the contractor an option, government insistence on one alternative "changes" the contract. Aptly stated by the boards, "[w]hen a contract prescribes the desired end but not the means of accomplishing that end, it is within the contractor's discretion to select the method by which the contract will be performed. A Government order rejecting the proposed method and requiring the contractor to perform in some other specified manner denies the contractor the opportunity to exercise a valid option as to the method of performance and changes the contract, justifying an equitable adjustment for additional costs incurred thereby." *Appeal of John Murphy Constr. Co.,* AGBCA 418, 79–1 BCA 13836, 1979 WL 2132 (1979), citing *Appeal of Mann Construction Co., Inc.,* AGBCA 444, 76–1 BCA 11710, 1976 WL 24704 (1976).

■■■■ Giving full consideration to the record, the court cannot determine whether defendant's actions were directives which amounted to a constructive change order.[23] In order for a change to be valid, three essential elements include: it must be within the scope of the contract; in the form of a direction to the contractor; and ordered by an authorized government official. Moreover, when the contractor and the government interpret a contract in a different manner, regardless of who is misinterpreting, the contractor has the continuing duty to perform the contract according to the government's taste. *See* FAR 52.243–1(e); *Discount Co. v. United States,* 213 Ct.Cl. 567, 554 F.2d 435, 440 (1977) (holding that contractor's claim that change was not ordered, but merely a proposal, does not excuse con-

---

**23.** There is no evidence that a change order was officially issued or even discussed by the con- tracting officer (CO).

tractor's duty to continue performance and to perform the contract according to government's preference); *see also, Appeal of Leming. Constr. Co., Inc.,* ASBCA 32425, 91–1 BCA 23300, 1990 WL 158927 (1990), *Appeal of Atterton Painting & Constr., Inc.,* ASBCA 31471, 88–1 BCA 20478, 1987 WL 46173 (1987) (holding that proper action for contractor was to continue to perform and seek reimbursement through an equitable adjustment rather than abandoning work).

During oral argument, defendant stated that a change order was not issued because defendant did not want to interfere with the contract plaintiff had executed with GVEA.[24] The court finds this more a strained excuse than a serious argument. Defendant had 6 months to issue the change order, and make it contingent on the APUC findings. It is much more likely that if defendant wanted the contract performed one way, it would hardly be concerned with plaintiff's problem of altering its contract with GVEA to meet defendant's needs.

The court, also, cannot determine exactly what harm plaintiff would have suffered if it had installed the single point master meter. The record does not clearly establish any difference in installation costs to plaintiff. Plaintiff does complain that it will withstand significant damages in approximately 14 years if the units become commercial rentals. If that occurs, plaintiff would then have to reinstall individual meters.[25]

▇▇▇ This contract is unique, because the contractor is not working on a project solely for the government's benefit. Plaintiff has an independent economic interest in the final disposition of the venture, due to the possibility that it will assume responsibility to rent the units to the general public after the government lease expires. Therefore, it seems that plaintiff avoided following common procedures. To put it simply, when a dispute arises during a construction contract, the contractor will generally follow the government's preference when performing the contract, but preserve the right to an in-

crease in the contract price through an equitable adjustment. *See e.g., J.B. Williams Co. v. United States,* 196 Ct.Cl. 491, 450 F.2d 1379 (1971) (determining that government directive to proceed beyond contractor's reasonable interpretation of the contract was a constructive change and entitled contractor to an equitable adjustment). Plaintiff is not entitled to disregard defendant's request just because that will create an increased expense after the lease expires. The government, just as any other party, should receive what it contracts for and has a right to accept only what conforms to contract specifications. *Cascade Pacific Int'l v. United States,* 773 F.2d 287, 291 (Fed.Cir.1985). Customarily in government procurement, "where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 48 (1985). Therefore, it is unclear why what happens *after* the parties' contract expires affects plaintiff's performance during the contract. The court acknowledges, however, that facts and circumstances under which the parties contracted are not easily recreated in written briefs. The court, therefore, cannot sufficiently discern from the record whether plaintiff breached its contract with defendant when it refused to install a single point master meter.

This claim raises factual questions which the court cannot resolve on summary judgment motions. Because these factual issues are material to the outcome of the instant case, summary judgment is precluded. See *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509.

### Conclusion

For the foregoing reasons, summary judgment for plaintiff on Counts III, IV, and V is granted and defendant's cross-motion for summary judgment on these counts is denied. On Counts II, VI, and VII summary judgment for defendant is granted and sum-

---

**24.** Oral Argument Tr. p. 104.

**25.** During oral argument, the court questioned plaintiff about extending the waiver. Plaintiff

responded that an extension of the waiver would be unlikely. Plaintiff admits, however, that this option was never really explored.

mary judgment for plaintiff on these counts is denied.

On Counts VIII, IX, and X, plaintiff and defendant squarely conflict on facts which are material to the ultimate issue. Both sides are able to present evidence favorable to their position. In ruling on a summary judgment motion, however, "the weighing of the evidence, and the drawing of legitimate inferences from the facts are ... not [tasks] of a judge." *Jay*, 998 F.2d at 982 (*quoting Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513). While defendant's interpretation of the evidence is certainly plausible, plaintiff's argument is also justified in light of its own affidavits, which the court must accept as true for purposes of a summary judgment motion. *Id.* The resolution necessitates "full ventilation of the facts" at trial. *Philadelphia Suburban Corp. v. United States*, 217 Ct.Cl. 705, 707, 1978 WL 8442 (1978).

A status conference concerning discovery and pretrial proceedings in Counts VIII, IX, and X pursuant to RCFC, Appendix G, will be held on January 18, 1994, at 3:30 p.m.

IT IS SO ORDERED.